Filed 8/14/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S061026 |
| v. | ) | |
| | ) | |
| GENE ESTEL McCURDY, | ) | |
| | ) | Kings County |
| Defendant and Appellant. | ) | Super. Ct. No. 95CM5316 |
| _____ | ) | |

A jury convicted defendant Gene Estel McCurdy of the first degree murder (Pen. Code, § 187, subd. (a)),[1] kidnapping (§ 207, subd. (a)), and kidnapping with the purpose to commit a lewd act on a child under 14 years old (§ 207, subd. (b)) of Maria Piceno.  The jury found true the special circumstance allegation of kidnapping murder.  (§ 190.2, subd. (a)(17)(B).)  The jury returned a verdict of death.  The trial court denied defendant's automatic motion to modify the penalty verdict (§ 190.4, subd. (e)), sentenced him to death on the murder count, and suspended the imposition of sentencing on the remaining counts.

This appeal is automatic.  (§ 1239, subd. (b).)  We affirm the judgment.

## I. FACTS

Eight-year-old Maria Piceno disappeared on March 27, 1995,[2] and her body was discovered approximately two weeks later.  At trial, defendant admitted being

_____

[1]    All further statutory references are to the Penal Code unless otherwise indicated.
[2]    All further chronology references are to 1995 unless otherwise indicated.

1

in the vicinity of Piceno's last known whereabouts, but denied kidnapping or killing her.

### A. Guilt Phase

#### 1. Prosecution Evidence

Around 3:00 p.m. on March 27, Arcelia Ferrel sent her eight-year-old daughter Maria Piceno to buy some food at Food King, a store two blocks away from their Lemoore apartment. About 20 minutes later, Ferrel went to look for Piceno, but could not find her. A receipt from the store indicated Piceno had bought some food at 3:18 p.m.

Eric Douglas saw Piceno in the Food King aisle where ice cream products were displayed. He recalled it being around 3:43 p.m. About 15 minutes later, Douglas saw Piceno in another store in the same shopping center as Food King.

Mychael Jackson saw defendant talking to Piceno and holding her hand outside of Food King. Jackson walked to his car, which was approximately 15 feet from defendant's truck. Jackson saw defendant open the truck's passenger door and "somebody short" got inside. Defendant then closed the door and walked around the truck to the driver's side. As Jackson drove off, he could no longer see Piceno in the parking lot. Although his car's clock indicated this happened around 4:00 p.m., he estimated it was actually 3:50 p.m. because he had set the clock to be 10 minutes fast.

Jackson admitted he had suffered a felony fraud conviction while defendant's case was pending. He denied receiving any benefit for his testimony or knowing that a reward had been offered for information regarding the murder. Jackson denied any involvement in Piceno's disappearance.

A receipt from a video store in the same shopping center as Food King indicated defendant rented three unrated "adult" videos at 3:28 p.m. that day. A

2

receipt from another video store in Lemoore indicated that defendant rented three "X-rated movies" at 3:34 p.m. A third receipt indicated defendant rented three "[p]ornographic films" around 4:10 p.m. from another video store in Lemoore. The jury heard the titles of the nine movies.

Mary Smith lived next to defendant and previously had been in a brief romantic relationship with him. Smith's mother, Mary Lazaro, was visiting Smith on the day of Piceno's disappearance. That evening Lazaro heard through the common wall shared with defendant's apartment what sounded like a child's soft whimpering. There were no children in the movie they were watching. Because Lazaro thought the whimpering was coming from defendant's apartment, Smith told her he did not have any children.

The next day, defendant and Smith were watching television together in her apartment when a news bulletin came on about Piceno's disappearance. Defendant sat up, faced the television, and shifted uncomfortably.

A few days after Piceno's disappearance, Smith told defendant she felt bad that the girl was missing. Defendant, who normally was an attentive listener, interrupted Smith in a hostile manner while not making eye contact with her.

Sometime during the last week of March defendant shaved off his mustache.

Defendant, who was in the United States Navy, was scheduled for a six-month deployment at sea starting around April 11. In the week preceding the deployment and while at sea, one of defendant's squadron mates noted he appeared to be unusually agitated, frustrated, and distant.

On April 9, Piceno's fully clothed body was discovered in Poso Creek, which was located in the greater Bakersfield area. Defendant's parents' house was in Bakersfield. Defendant's sister testified defendant was familiar with this creek because it was a well-known local landmark. A shower curtain similar to one that

3

had been given to defendant would later be discovered partially buried approximately 500 yards upstream from Piceno's body.

Carole Cacciaroni, a criminal investigator employed by the Navy and stationed on the same ship as defendant, interviewed him on April 18. When Agent Cacciaroni asked defendant if he knew why she wanted to speak to him, he referred to Piceno's disappearance. Defendant explained he was renting adult-oriented videotapes at the video store in the shopping center around the time when Piceno was abducted. Defendant offered to be hypnotized to see if it would help him remember anything. Defendant denied knowing what had happened to Piceno. Defendant told Agent Cacciaroni that prior to his deployment he regularly visited his parents' home. When Agent Cacciaroni informed defendant that Piceno was found dead, he became very upset, started to cry, and asked if Piceno had been molested. Defendant explained he was upset because he had recently quit smoking and had been under some stress.

The next day, defendant told Agent Cacciaroni that he was feeling "very disturbed" and "paranoid" because "everybody was pointing fingers at him and that he was sick to his stomach." Defendant appeared visibly upset, had red and teary eyes, tightly clenched fists, and "shaky" movements. Defendant told Agent Cacciaroni that he did not know if he should "get a lawyer." When Agent Cacciaroni asked him why he thought he might need an attorney, defendant continued to cry and rock in his chair. Defendant left Agent Cacciaroni's office, but returned a short while later and appeared to be much more relaxed. Agent Cacciaroni ran into defendant a few days later, and he acted "standoffish" and distant.

Police searched defendant's storage unit in Lemoore and found a box of approximately 30 adult-oriented magazines, several of which had sexually explicit titles and content focusing on teenaged women who were staged to appear younger

4

than their actual age.  A list of titles of some of the recovered magazines was admitted into evidence, but the magazines themselves were not.

Defendant later told Bruce Ackerman, a federal deputy marshal assigned to the United States Postal Service and an expert on child pornography, that he had purchased the magazines.  He also acknowledged the women in them looked younger than 18 years old.  At defendant's trial, Deputy Ackerman testified that, in his experience, in every case in which a person had possessed similar magazines, that person had expressed a sexual interest in minors.   Deputy Ackerman conceded he usually investigated only people who had expressed such an interest.

Deputy Ackerman also testified at trial that, when asked about the day of Piceno's disappearance, defendant said he could not remember what he had done after renting the videotapes.

Defendant's younger sister testified that he molested her when they were children.  The molestations continued intermittently for over a decade.  Several years after the abuse had ended, defendant apologized to his sister for molesting her, and told her that one of the reasons why he never married was "he was really afraid that he might molest his own children."

A forensic pathologist conducted an autopsy, determined Piceno did not die from a heart attack or other natural causes, and concluded she had died from suffocation.  Piceno also had non-life-threatening blunt force injuries.  The pathologist could not locate Piceno's hymen, which was consistent with either molestation or decomposition.  Based on the creek's temperature and the state of decomposition, the pathologist estimated Piceno's body could have been in the water for as long as two weeks.

5

## 2. *Defense Evidence*

Claudeen Jackson, who was married to Mychael Jackson but had filed for divorce, believed him to be an "impulsive liar" because he "constantly" lied to her during their marriage. On cross-examination, she admitted she had suffered a felony fraud conviction while defendant's case was pending. Annie Snowden, Jackson's ex-wife, testified he was "the biggest liar you will ever run into. He lies about everything." Two of Jackson's ex-girlfriends both also were of the opinion that he generally was dishonest.

A Lemoore police officer testified about discrepancies in Mychael Jackson's testimony. For example, at trial Jackson testified that he looked at his car's clock when he entered Lemoore, but he had not mentioned to the interviewing officer the clock was fast. At trial he described the T-shirt defendant wore on the day of Piceno's abduction, but when initially interviewed by the police Jackson had not provided any details about defendant's T-shirt. Jackson's testimony also included other details about defendant's apparel and vehicle that were not mentioned during his initial interview.

A Lemoore police sergeant testified he interviewed Smith, defendant's ex-girlfriend, after defendant had deployed. Smith told the sergeant that, before his deployment, defendant said he shaved his mustache so he would not have to maintain it while he was at sea. Smith did not tell the sergeant that her mother had heard a child's whimper.

A Tulare County Sheriff's detective testified about Angelica R., a 10-year-old girl who had been abducted in Visalia approximately a year before Piceno's death. Angelica R.'s body was discovered in an irrigation ditch approximately 45 miles away from where Piceno's body was found. Defendant was stationed in the State of Washington when Angelica R. was abducted and he was not the donor of sperm recovered from her body. Unlike Piceno, Angelica R.

6

had been strangled, was discovered nude from the waist down, and had been raped.

Defendant testified and denied any involvement with Piceno's disappearance and death. On the day of Piceno's abduction, defendant returned 12 adult-oriented videotapes and rented nine more, then went to his apartment and watched all nine videos, which he accomplished by watching portions of them in the fast forward mode of play.

Defendant had been romantically involved with Smith, but denied being in her apartment after Piceno's disappearance, as Smith had reconciled with her husband by then. Defendant denied having the conversation about Piceno in which Smith claimed he interrupted her.

Defendant claimed he shaved off his mustache around a week before his deployment because he was not taking his electric razor with him. Defendant admitted to being "edgy" during his deployment, but claimed his mood was caused by the stress of a new job that had a lot of responsibility.

Defendant admitted he lied to Deputy Ackerman about not knowing his whereabouts on the day of Piceno's disappearance, but claimed he was embarrassed by having rented so many adult-oriented videotapes. Defendant admitted to having twice visited the creek where Piceno's body was found. He denied owning or possessing a shower curtain resembling the one found near Piceno's body.

Defendant admitted to engaging in sexual activities with his sister while they were growing up, but claimed the encounters were consensual. Defendant and his sister had admitted to each other that they both had been molested by their uncle. Defendant denied having a sexual interest in children.

7

### B. Penalty Phase

#### 1. *Prosecution Evidence*

Piceno's mother Arcelia Ferrel testified that her daughter was a helpful and thoughtful child who wanted to be a doctor when she grew up. Piceno's abduction and death made Ferrel very afraid, and she also feared for the safety of her other children. Piceno's death caused Ferrel to have nightmares, and her family was still in counseling. Ferrel brought some of Piceno's mementos to court.

#### 2. *Defense Evidence*

Defendant's mother, Anetta McCurdy, testified about his life growing up. Defendant was the oldest of four children and participated in the Boy Scouts. The family was very poor. Defendant was helpful, did not cause problems, and had never been in trouble with the law. After graduating from high school, defendant entered the Navy and had been awarded the Naval Achievement Medal.

The stress caused by defendant's trial had been extremely difficult on his family, worsened his parents' health, and caused his mother to have nightmares. Anetta wanted defendant to live.

## II. DISCUSSION

### A. Pretrial Claims

#### 1. *Change of Venue*

Before jury selection, defendant unsuccessfully moved to change the venue of his trial from Kings County. Defendant contends the trial court prejudicially erred by denying his motion.[3] We disagree.

---

[3] We note that in this claim and most others on appeal, defendant contends that the asserted error or misconduct he raises infringed his state and federal constitutional rights to a fair and reliable trial. *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17 (*Boyer*), applies in the present case: "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to

*(footnote continued on next page)*

A defendant's motion to change venue must be granted "when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." (§ 1033, subd. (a).) "Reasonable likelihood" in this context " 'means something less than "more probable than not," ' and 'something more than merely "possible." ' [Citation.]" (*People v. Proctor* (1992) 4 Cal.4th 499, 523 (*Proctor*).) " ' "The trial court typically considers the nature and gravity of the offense, the size of the community, the status of the defendant and the victim, and the nature and extent of the publicity. On appeal, the defendant must show that denial of the venue motion was error (i.e., that it was reasonably likely a fair trial could not be had at the time the motion was made) and that the error was prejudicial (i.e., that it [is] reasonably likely a fair trial was not in fact had). We will sustain the court's determination of the relevant facts where supported by substantial evidence. We independently review the court's ultimate determination of the reasonable likelihood of an unfair trial." ' [Citation.]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1124-1125 (*Zambrano*).)

---

*(footnote continued from previous page)*

make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none."

In his motion, defendant contended his case had garnered significant media attention. It had been featured on the national television show, *America's Most Wanted*. Three regional newspapers had published about 60 articles on the subject, and four regional television stations had broadcast numerous reports. Notably, one newspaper article quoted an anonymous law enforcement officer who, despite an order barring communication with the media,[4] said that defendant "basically admitted to everything. . . . He's guilty as sin." Another article reported on a public memorial that was held for Piceno. In his motion, defendant also contended the order barring communication with the media prevented him from correcting inaccurate media accounts.

Without stating its reasons, the trial court denied defendant's motion without prejudice, allowing him to renew it "at a later date." He did not do so.

The Attorney General preliminarily contends defendant forfeited this issue on appeal because he did not renew his motion. " ' "[W]hen a trial court initially denies a change of venue motion without prejudice, a defendant must renew the motion after voir dire of the jury to preserve the issue for appeal." ' [Citation.]" (*Zambrano*, *supra*, 41 Cal.4th at p. 1124.) We agree with the Attorney General that the claim is forfeited.

Defendant concedes he did not renew his motion after voir dire, but contends it would have been futile for him to renew his motion because the trial court was predisposed to keep his trial in Kings County. (Cf. *People v. Hill* (1998) 17 Cal.4th 800, 820 [claim of prosecutorial misconduct not forfeited on appeal if a timely objection and request for admonishment would have been futile].) In

---

**4**      At the outset of the case, the trial court barred all parties, including law enforcement investigators, from communicating with the media about defendant's case. Defendant does not challenge this ruling on appeal.

support, defendant cites the court's remarks during a hearing regarding the order barring communication with the media, in which the court stated it believed a change of venue could impose an undue burden upon the victim's family's "right" to attend the trial. The court's comments regarding the family's right to a convenient venue were made nearly a year *before* defendant moved for a change of venue, when the court was ruling on another issue. Even assuming futility could excuse defendant's failure to renew his motion, the court's isolated remark does not establish irreversible hostility to changing venue.

In addition, even if the claim had not been forfeited, substantial evidence supports the trial court's ruling. The first factor of the legal analysis — the nature and gravity of the offense — favored a change of venue, but it did not compel one. The abduction and murder of a young girl from a shopping center is a shocking and serious crime, and the allegations of incestuous molestations were sensational. But the disturbing facts inherent in most capital murder cases standing alone do not require a change of venue. (*People v. Pride* (1992) 3 Cal.4th 195, 224.) Although prospective jurors would likely sympathize with Piceno's fate, this sympathy stems from the nature of the crime, and not the locale of the trial. (*People v. Davis* (2009) 46 Cal.4th 539, 578.)

As to the second factor — the nature and extent of the media coverage — it did not heavily favor a change of venue. Of the approximately 60 newspaper articles published about defendant's case before his motion to change venue, around a third of them were published in the two months following his arrest. Defendant's trial occurred around 20 months after his arrest. The passage of time ordinarily blunts the prejudicial impact of pretrial publicity. (*People v. Harris* (2013) 57 Cal.4th 804, 827 (*Harris*).) Moreover, we have affirmed the denial of motions to change venue in cases with more media coverage. (E.g., *id.* at pp. 823-825 [48 newspaper articles, 294 television reports; media coverage

11

described as "substantial"]; *People v. Ramirez* (2006) 39 Cal.4th 398, 434 [coverage of serial murder case described as " 'saturation' "].)

The newspapers reported that the trial court excluded most of the questioning conducted by the police, and some articles included facts not admitted at defendant's trial. In addition, defendant specifically cites a newspaper article's coverage of his arraignment, at which he "appeared subdued as he arrived at the Kings County government complex . . . , his chin tucked into the collar of a bullet proof vest. [¶] Insults and jeers were hurled as [defendant] passed by a crowd who gathered to watch the spectacle. 'No rope too short . . . Death penalty, you bet,' onlookers cried out." Another article commented, "One could almost feel the deep sigh of relief the entire city of 13,000 breathed when news got out that someone had been caught . . . ." Another article reported that one of defendant's distant relatives had received a death threat. Defendant further notes that some of the articles reported he was a suspect in the abduction or murder of other juvenile victims in California and Washington.

The record, however, discloses the tone of most of the articles was relatively neutral, and none was especially prejudicial or inflammatory. (See, e.g., *People v. Famalaro* (2011) 52 Cal.4th 1, 22-23 (*Famalaro*); *People v. Prince* (2007) 40 Cal.4th 1179, 1218-1219 (*Prince*); *People v. Panah* (2005) 35 Cal.4th 395, 448 [recitation of inherently disturbing facts does not demonstrate media bias].) Moreover, a number of the articles focused not on defendant, but the court's order barring communication with the media. Other articles contradicted the reports that he was a suspect in other child abductions, and presented defendant's mother's statement that she believed he was innocent. Particularly in light of the timing of the majority of the reporting mentioned above, the newspaper coverage did not strongly weigh in favor of a change of venue.

12

An episode of the nationally televised show *America's Most Wanted* reported on Piceno's abduction. The record does not contain any details about the episode other than that it aired soon after Piceno's disappearance, which occurred nearly two years before defendant's trial. Moreover, as *America's Most Wanted* was broadcast nationally, "a change of venue could not be expected to dilute its prejudicial effect." (*Zambrano*, *supra*, 41 Cal.4th at p. 1127; see *People v. Riggs* (2008) 44 Cal.4th 248, 279-281 (*Riggs*) [no finding of juror bias when three seated jurors acknowledged seeing an episode of *America's Most Wanted* featuring the defendant's case]; *People v. Bolin* (1998) 18 Cal.4th 297, 312-314 [affirming denial of motion to change venue where 20 percent of the venire and three seated jurors had seen episodes of *America's Most Wanted* featuring the defendant's case].)

With respect to the third factor — the size of the community — its size at the time of defendant's trial did not weigh heavily in favor of change of venue. " 'The size of the community is important because in a small rural community, a major crime is likely to be embedded in the public consciousness more deeply and for a longer time than in a populous urban area.' [Citation.]" (*People v. Vieira* (2005) 35 Cal.4th 264, 280 [affirming denial of change of venue motion in a capital case in Stanislaus County, population approximately 370,000].) The size of the county, however, is not determinative; the critical factor is whether the size of the population was sufficient to dilute adverse publicity. (*Proctor*, *supra*, 4 Cal.4th at p. 525.)

At the time of defendant's trial, the population of Kings County was 116,312. We have found reversible error in the denial of change of venue motions in capital cases in comparably sized counties. (E.g., *People v. Williams* (1989) 48 Cal.3d 1112, 1126 (*Williams*) [Placer County, population approximately 117,000]; *Martinez v. Superior Court* (1981) 29 Cal.3d 574, 582 (*Martinez*) [Placer County,

13

population 106,500]; *Frazier v. Superior Court* (1971) 5 Cal.3d 287, 293, fn. 5 [Santa Cruz County, population 123,790]; *Fain v. Superior Court* (1970) 2 Cal.3d 46, 52, fn. 5 [Stanislaus County, population 184,600].)

On the other hand, we have also affirmed the denial of change of venue in capital cases tried in comparably sized communities. (E.g., *People v. Hayes* (1999) 21 Cal.4th 1211, 1250-1251 [Santa Cruz County, population under 200,000]; *Proctor*, *supra*, 4 Cal.4th at p. 525 [Shasta County, population approximately 122,100]; see *People v. Coen* (1928) 205 Cal. 596, 604-607 [Kings County].) We cannot say the population size of Kings County by itself compelled a change of venue; it may have at most somewhat favored one. (See *Proctor*, *supra*, 4 Cal.4th at p. 526.) In *Williams*, for example, in addition to the size of the county, our reasons for reversing the trial court's denial of a motion to change venue included the fact that a substantial percentage of the venire knew either the victim, her family, or people in the district attorney's office. (*Williams*, *supra*, 48 Cal.3d at p. 1130.) That was not the case here.

The fourth factor — the community status of the defendant, meaning whether defendant had any prominence in the community before the crimes — did not weigh heavily for or against change of venue. Defendant was not well known before his arrest. (See *Famalaro*, *supra*, 52 Cal.4th at p. 23.) Because defendant had lived in Kings County for only six months before the crimes occurred, he may have been perceived as an outsider by the community. (See *ibid.*) But defendant also had no previous criminal record and was not a member of a racial or ethnic group that could be subject to discrimination. (See *People v. Rountree* (2013) 56 Cal.4th 823, 839; cf. *Williams*, *supra*, 48 Cal.3d at pp. 1126, 1129-1130 [the defendant was an African-American tried in a small county in which only 0.4 percent of the population was African-American].) There is no evidence he belonged to a group to which the community was likely to be hostile; rather,

14

defendant was serving in the Navy when Piceno was abducted. (Cf. *Martinez*, *supra*, 29 Cal.3d at p. 584 [victim's status of being an employee of the county's largest employer favored a change of venue].)

The fifth factor — the community status of the victim, meaning whether the victim had any prominence in the community before the crimes — did not support a change of venue. Although eight-year-old Piceno was undoubtedly a highly sympathetic victim, she was prominent only due to her being murdered. (Cf. *Williams*, *supra*, 48 Cal.3d at pp. 1129-1130 [victim came from a prominent family in the community].) Piceno was not known to the public before her disappearance and there was no evidence she or her family had extensive ties to the community. (See *Famalaro*, *supra*, 52 Cal.4th at pp. 23-24.) Moreover, any sympathy garnered by Piceno's young age and vulnerability would have been apparent regardless of where defendant was tried. (See *Prince*, *supra*, 40 Cal.4th at p. 1214.) A newspaper article did report on a public memorial held for Piceno, but nothing in the record suggests this influenced the venire. (See *Harris*, *supra,* 57 Cal.4th at p. 829.)

In sum, although some of the factors may have favored a changed venue, the totality of circumstances did not require one. The trial court properly ruled that defendant failed to demonstrate there was a reasonable likelihood he could not receive a fair and impartial trial in Kings County.

Defendant also fails to demonstrate a reasonable likelihood he was prejudiced, that is, that he did not in fact receive a fair and impartial trial. (See *Proctor*, *supra*, 4 Cal.4th at p. 523.) "With regard to the second part of the showing, in order to determine whether pretrial publicity had a prejudicial effect on the jury, we also examine the voir dire of the jurors." (*Id.* at p. 524.) During voir dire, although most prospective jurors expressed some familiarity with defendant's case, only seven prospective jurors of around 100 were excused for

15

cause based on the trial court's finding that they had been overly exposed to pretrial publicity.

" 'The relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant.' [Citation.]" (*Famalaro*, *supra*, 52 Cal.4th at p. 31.) Nothing in the record suggests that any of the seated jurors could not put aside outside influences and fairly try the case. Nor does the record disclose evidence that any of the seated jurors harbored a bias that was not detected during voir dire.

Moreover, defendant did not exhaust his peremptory challenges and did not object to the seated jury's composition. This suggests defendant at trial believed the jury was fair and impartial. (See *People v. Beames* (2007) 40 Cal.4th 907, 922.)

### 2. *Motion to Suppress*

From April 30 through May 3, law enforcement officials extensively questioned defendant. Before his trial, defendant moved, pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), to exclude all statements he made during this questioning on the grounds they were unknowingly and involuntarily given. Defendant also moved to exclude Mychael Jackson's testimony as a "tainted fruit" of these questions. The trial court granted in part his motion, and excluded from trial many of defendant's statements. Arguing that his statements violated *Miranda*, and were involuntary, defendant contends the court erred in not excluding all of his statements and Jackson's testimony. We are not persuaded that reversible error occurred.

The trial court divided defendant's responses to the questioning into five sections: (1) statements he made before receiving the *Miranda* warning;

16

(2) statements he made after receiving the warning until he first said he wanted a lawyer; (3) statements made after he reinitiated the conversation until he insisted he did not want to answer questions about his childhood; (4) statements made thereafter during a protracted period in which four more times he expressed a desire for an attorney; and (5) all statements made after the last of these requests. The court ruled that all statements he made in sections one through three were admissible; that statements in the fourth section were admissible only for impeachment purposes; and that statements in the fifth section were not admissible for any purpose. The court also ruled Jackson's testimony was admissible.

As we will explain, the trial court correctly admitted into evidence all of defendant's statements in sections one through three described above. Any error as to the admission, for impeachment only, of defendant's statements made in section four was harmless. The court also correctly admitted Jackson's testimony.

### a. Background

On April 30, Lieutenant Mark Bingaman of the Kings County Sheriff's Office, Agent Mike Devine of the Naval Investigative Service, Deputy Marshal Bruce Ackerman, and a Lemoore police officer flew from California to defendant's ship, which was at sea near Japan. Defendant had worked that day. Around 10:00 p.m., defendant's commanding officer ordered him to be escorted to an interview room.

### 1. Statements made before receiving Miranda warning

Deputy Ackerman and Lieutenant Bingaman started to question defendant. Deputy Ackerman asked, and defendant answered, several questions about his background, such as his upbringing, his decision to join the Navy, and his hobbies. Deputy Ackerman offered defendant some water, which he accepted.

17

### 2. Miranda *warning and subsequent statements*

Lieutenant Bingaman then advised defendant of his rights to remain silent and to the presence and assistance of counsel. Defendant acknowledged he understood his rights. Lieutenant Bingaman asked for his help with the investigation, and defendant responded, "They always tell you get a lawyer. . . . I don't know why." Deputy Ackerman told defendant that they could not advise him, but stressed it was important for him to help with Piceno's disappearance, and added, "You know what we're trying to do is we're trying to help you."

When defendant then expressed difficulty breathing, Deputy Ackerman suggested that he take his time and take deep breaths. Deputy Ackerman continued his questioning, during which defendant told him that he could not relax, requested cigarettes and water, continued to have problems breathing, expressed confusion, and became emotional. At one point, Lieutenant Bingaman left the interview room and a short while later Agent Devine entered. Deputy Ackerman and Agent Devine questioned defendant about the adult-oriented magazines found in his storage unit. Agent Devine explained that "a lot of people that had these kind of magazines [may have] had something happen in their lives," and asked defendant if anything had happened to him when he was younger. Defendant responded, "I can't say. I want a lawyer." Deputy Ackerman started to close his file and leave the room.

### 3. *Statements made after defendant reinitiated the conversation*

Around 20 seconds later, defendant said, "I don't know if you guys got any other suspects or what." Agent Devine explained they were talking to several people. The questioning then resumed. Soon thereafter, defendant said, "I don't know what to do," and added, "I [want to] help you guys, I want you guys to find him, but I don't want to incriminate myself." Deputy Ackerman continued to

18

question defendant, and asked him several questions about his sister.  Defendant then said, "I can't talk no more."  Deputy Ackerman, however, offered him more water, and continued with the questioning.

Agent Devine then questioned defendant.  When Agent Devine inquired about defendant's childhood, defendant replied, "I'd rather not say."  Agent Devine pressed the subject, but defendant stated four times more that he did not want to talk about his childhood.

### 4. *Statements made after defendant stated he did not want to discuss his childhood*

Deputy Ackerman further questioned defendant.  Defendant acknowledged that he was "dealing with" some issues.  Defendant offered to give the officers a blood sample.  Defendant could not think of anything that might help the officers to understand him or his "situation" better.  Defendant said he believed the officers thought he was guilty because of his adult-oriented magazines and because they had come from California to question him.

Deputy Ackerman showed defendant a letter that referenced a child and contained the phrase "Lover's Dreams."  Defendant assumed the letter was written by Piceno's murderer, and described it as "gibberish."  Deputy Ackerman told him that the letter was recovered from his storage unit, which defendant denied. Defendant offered to provide a handwriting sample to prove he did not write the letter.

Defendant then said, "I want a lawyer, enough said."  Defendant assumed the officers were going to show him photographs of Piceno's body, and said he did not want to see them.  The questioning briefly continued and defendant said twice more that he wanted a lawyer.  Deputy Ackerman explained that he and Agent Devine were going to talk for a minute, and they left the room.

19

Approximately 20 minutes later, Lieutenant Bingaman reentered the room, woke defendant up, and asked defendant about his request for a lawyer. In the course of doing so, Lieutenant Bingaman resumed questioning defendant.

Defendant stated he wanted to talk with a lawyer about the letter Deputy Ackerman had shown him. Defendant told Lieutenant Bingaman two other people also had boxes in his storage unit; he told him their names and suggested the letter came from one of their boxes. Defendant described one of these other people as "not all there."

Defendant admitted to Lieutenant Bingaman that he had rented videotapes from multiple stores on the day of Piceno's disappearance, contrary to any of his prior statements that may have implied that he had visited only the video store in the shopping center from which Piceno was abducted. Defendant told Lieutenant Bingaman he had no idea who abducted Piceno but he "didn't do it." Defendant described his truck to Lieutenant Bingaman. Defendant knew that Piceno was abducted on a Monday, but stated he remembered that detail because it was mentioned in the news reports.

Defendant admitted the adult-oriented magazines taken from the storage unit were his. Lieutenant Bingaman questioned defendant about notes he had made about adult-oriented movies, and he replied, "I'd rather not [tell] you." Defendant told Lieutenant Bingaman, "[O]nce you clear me, people are still going to look at me as a pervert." Lieutenant Bingaman continued to ask about defendant's notes. Defendant denied that he ever sold any videotapes for profit, but admitted he had multiple videocassette players, which could be used to copy videotapes. Defendant admitted he had dated several 16-year-old girls, including one when he was 28 years old.

Defendant told Lieutenant Bingaman that he covered his apartment's windows because he used to work nights and doing so helped block out the daylight.

Defendant, who lived in a town near Lemoore, stated he went to the video stores in Lemoore because they had a good selection. Defendant told Lieutenant Bingaman that after he rented the videotapes, he picked up his mail from the post office, but he could not remember what he did after that. Defendant offered to submit to a polygraph examination.

Lieutenant Bingaman inquired about a motel reservation made under defendant's name. Defendant responded, "Okay, here we go again. I [want to] see a lawyer."

5. *Statements made after defendant's "here we go again" response*

Lieutenant Bingaman soon thereafter asked defendant, "[Y]ou want me to talk to you?" and defendant responded that he wanted the lieutenant to explain himself. Lieutenant Bingaman stated he wanted to know why defendant had made a reservation in a motel on the day of Piceno's disappearance. Defendant denied making any reservations. Lieutenant Bingaman asked defendant who was setting him up if he did not make the reservation. Defendant asked why anyone would do that, and Lieutenant Bingaman responded, "I swear with everything holy to me that, that your name is on reservations at [the motel] on the day that that little girl is taken and [you have got to] give me an answer on that or [I am going to] have to make some hard decisions whether I'm taking you back to the [S]tates."

The questioning continued until around 4:00 a.m., when Lieutenant Bingaman told defendant he was under arrest. Agent Devine, however, then told defendant that Lieutenant Bingaman lacked the authority to arrest him. Defendant's commanding officer ordered him to be confined, and defendant was

21

transferred to a military base in Japan on May 1. Defendant was questioned on May 2 and May 3 until he was transferred to the custody of civilian authorities. On May 3, the trial court issued a warrant for defendant's arrest.

### b. Trial court's ruling on defendant's statements

Following an evidentiary hearing on defendant's motion to exclude his statements and to preclude Jackson from testifying, the trial court granted defendant's motion in part. The court first ruled defendant's statements before being advised of his *Miranda* rights were voluntarily made and therefore admissible because of the nonincriminating nature of the questioning. The court ruled defendant's postadvisement statement that "[t]hey always tell you get a lawyer" was not an invocation of the right to counsel, and his continuing to talk was an implied waiver of his rights.

The trial court further ruled that defendant's statement "I want a lawyer" after being asked if anything had happened to him when he was younger was an invocation of his right to counsel, but in reinitiating the conversation by saying, "I don't know if you guys got any other suspects or not," he again waived his rights. The court based its finding on the nonincriminating nature of the preliminary questioning, Deputy Ackerman's having advised defendant of his rights approximately an hour and 45 minutes earlier, defendant's initial waiving of his rights, the lack of intimidation tactics or improper inducements, defendant's understanding that he was a suspect, Deputy Ackerman's attempt to terminate the interview after defendant's invocation, and defendant's reinitiation of the conversation following his invocation.

The trial court ruled defendant's later repeated requests to not discuss his childhood was an invocation of his right to remain silent. The court acknowledged that a suspect's desire to not discuss a particular subject did not preclude further

22

questioning about other subjects.  It found, however, that here Agent Devine's repeated questions in spite of defendant's refusals violated his *Miranda* rights. The court suppressed from the prosecutor's case-in-chief all statements defendant made after he told Agent Devine that he did not want to talk about his childhood, including the statements he made after he had again requested a lawyer when the officers left him alone for 20 minutes.

The trial court also ruled that much of the questioning was involuntary due to the "prolonged repetitive high-pressured questioning interspersed with numerous instances of purposeful disregard of [defendant's] requests . . . ."  The court ruled that all statements made after the questioning about the motel room were involuntary and could not be used at defendant's trial for any purpose.

### c.  Discussion

Defendant contends all of his statements made during the questioning should have been excluded at trial because they were violative of *Miranda*, and also were involuntary.[5]

The applicable law is settled:  " 'As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*, required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that "he has the right to remain silent, that anything he says can be used against him in a court of law,

---

[5]     Defendant cursorily contends the admission of his statements also violated his Sixth Amendment right to counsel.  Other than a rote recitation, defendant does not explain how the questioning violated the Sixth Amendment to the federal Constitution.  In any event, the federal constitutional right to counsel does not attach until the initiation of formal judicial proceedings.  (*People v. Nelson* (2012) 53 Cal.4th 367, 371, fn. 1 (*Nelson*).)  The challenged statements at issue here were made before any formal judicial proceedings had begun.

that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." ' [Citations.]" (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 215 (*Sauceda-Contreras*).)

" ' "[I]f the accused indicates in any manner that he wishes to remain silent or to consult an attorney, interrogation must cease, and any statement obtained from him during interrogation thereafter may not be admitted against him at his trial" [citation], *at least during the prosecution's case-in-chief* [citations].' [Citation.] 'Critically, however, a suspect can waive these rights.' [Citation.]" (*Nelson*, *supra*, 53 Cal.4th at p. 374, italics added.) "The waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception' [citation], and knowing in the sense that it was 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' [Citation.]" (*Sauceda-Contreras*, *supra*, 55 Cal.4th at p. 219.)

In addition, "[t]he due process clause of the Fourteenth Amendment precludes the admission of any involuntary statement obtained from a criminal suspect through state compulsion." (*People v. DePriest* (2007) 42 Cal.4th 1, 34.) " 'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citations.] In determining whether a confession was voluntary " '[t]he question is whether defendant's choice to confess was not "essentially free" because his [or her] will was overborne.' " [Citation.] Whether the confession was voluntary depends upon the totality of the circumstances. [Citations.] " 'On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review.' " [Citation.]'

24

[Citation.] ' "[W]hen a reviewing court considers a claim that a confession has been improperly coerced, if the evidence conflicts, the version most favorable to the People must be relied upon if supported by the record.  [Citations.]" ' [Citation.]"  (*People v. Tully* (2012) 54 Cal.4th 952, 993 (*Tully*).)

### 1. *Statements made before receiving* Miranda *warning*

The trial court acknowledged defendant's statements at the beginning of the questioning were made before the officers advised him of his rights under *Miranda*, but found the statements were voluntarily given.  Defendant contends the court erred by ruling that the statements he made before being advised of his *Miranda* rights were voluntary and therefore admissible.  We disagree.  Law enforcement officers may speak freely to a suspect in custody provided " 'the speech would not reasonably be construed as calling for an incriminating response.'  [Citation.]"  (*People v. Gamache* (2010) 48 Cal.4th 347, 388 (*Gamache*).)  Deputy Ackerman's initial questions were not reasonably likely to elicit an incriminating response.  (See *People v. Dement* (2011) 53 Cal.4th 1, 26-27 [postinvocation questions about an unrelated homicide were not an impermissible questioning because they could not reasonably be construed as calling for an incriminating response].)  The initial questions here appear to have been an attempt by the officers to establish a rapport with defendant.  Indeed, defendant fails to explain how any statement he made in this portion of the questioning was used at his trial to implicate him in Piceno's disappearance or impeach his credibility.

### 2. *Statements made after receiving* Miranda *warning*

For the second section of the questioning, the trial court found the officers advised defendant of his rights under *Miranda*, that he acknowledged those rights and waived them, and his statements were voluntarily given.  Defendant contends

25

his statement to Lieutenant Bingaman, after acknowledging his *Miranda* rights, that "[t]hey always tell you get a lawyer" was an invocation of his right to counsel, and the court erred in ruling otherwise. We disagree. A suspect's invocation of the right to counsel must be unambiguous. (*Davis v. United States* (1994) 512 U.S. 452, 459.) The reference to an attorney must be sufficiently clear that a reasonable officer under the circumstances would understand the statement was a request for an attorney. (*Ibid.*) A reasonable officer in these circumstances could have concluded that defendant was expressing the abstract idea an attorney might be in his best interest, but he did not actually request one. Although officers may seek clarification of an ambiguous request, they are not required to do so. (*People v. Williams* (2010) 49 Cal.4th 405, 427.) Moreover, when Deputy Ackerman told defendant the officers could not advise him what to do, defendant continued to speak with them. Accordingly, defendant's further continuation of the conversation supports the conclusion that he did not intend his comment about getting a lawyer to be an invocation of his right to counsel.

Defendant further contends his statement that he didn't know why "[t]hey always tell you get a lawyer" indicates he did not understand the rights he was waiving by continuing the conversation with the officers. Lieutenant Bingaman, however, explained to defendant his rights, and defendant acknowledged he understood them. Even assuming defendant's statement was a true expression of his state of mind, and he did not fully appreciate the possible value in invoking his rights, this does not mean he was not aware of them, or did not understand the consequences of the decision to waive them.

Defendant contends his statements from this portion of the questioning were rendered involuntary by the officers' deceptive and manipulative tactics, promises of leniency, and threats. Defendant notes the officers did not advise him of his *Miranda* rights at the beginning of the questioning, he repeatedly expressed

26

discomfort during it, and Deputy Ackerman suggested he could discern if defendant was suppressing information. In addition, defendant points out that Deputy Ackerman told him "we're trying to help you," and "our motivation is not to give you grief or punishment." Applying our independent review, we agree with the trial court's determination that the statements made during this portion of the questioning were voluntary.

First, the officers' introductory questions were likely designed to establish a rapport with defendant, but even if they were successful, this does not establish that defendant's free will was overborne. (Cf. *People v. Honeycutt* (1977) 20 Cal.3d 150, 160 [conviction reversed due to the questioning officers' "clever softening-up" of the defendant by ingratiating themselves and disparaging the victim].) The use of deceptive statements during an investigation does not invalidate a confession as involuntary unless the deception is the type likely to procure an untrue statement. (*People v. Tate* (2010) 49 Cal.4th 635, 684 (*Tate*).) Even assuming defendant's fragile emotional state made him susceptible to Deputy Ackerman's suggestion he knew defendant was suppressing information, and that the deputy's suggestion was actually deceptive, defendant fails to explain how he incriminated himself as a result of this deception. (See *People v. Williams*, *supra*, 49 Cal.4th at pp. 444-445.) Indeed, defendant fails to explain which of his statements were untrue, as he denied abducting and killing Piceno. (See *ibid*.)

Next, a statement is involuntary and inadmissible when the motivating cause of the decision to speak was an express or clearly implied promise of leniency or advantage. (*Tully*, *supra*, 54 Cal.4th at p. 985.) Even assuming Deputy Ackerman did implicitly promise leniency, nothing in the record suggests that was defendant's motivation to speak to the officers. (See *id.* at p. 986.)

Finally, when the officers questioned defendant about a videotape he owned, he expressed concern that he might be prosecuted for "copyright infringements."

27

But because the officers assured defendant they were not concerned with any possible copyright violations, no threats of prosecution compelled him to continue talking to the officers.

### 3. *Statements made after defendant's first invocation of his right to counsel*

For the third section of the questioning, the trial court found defendant had invoked his right to counsel by saying, "I want a lawyer," but then again waived his rights by continuing the conversation with the officers around 20 seconds later; the court also found his statements were voluntarily given. Defendant contends the court erred in ruling that he voluntarily initiated contact after telling Agent Devine that he wanted a lawyer, thereby negating his invocation of the right to counsel.

If a suspect expresses a desire to deal with law enforcement only through counsel, the questioning must cease until counsel has been made available or the suspect initiates further communication with law enforcement. (*Edwards v. Arizona* (1981) 451 U.S. 477, 484-485.) " 'After a suspect has invoked the right to counsel, police officers may nonetheless resume their interrogation if "the suspect '(a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.' " [Citations.] The waiver must be " 'knowing and intelligent . . . under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.' " [Citation.]' [Citations.]" (*People v. Enraca* (2012) 53 Cal.4th 735, 752.) It is undisputed defendant clearly asserted his right to counsel, and, after doing so, the questioning stopped. But about 20 seconds later, as Deputy Ackerman prepared to leave the room, defendant chose to speak.

Applying our independent review, we agree with the trial court that defendant invoked his right to counsel, but then again waived that right when he

28

reinitiated communication with Agent Devine, saying, "I don't know if you guys got any other suspects or what." (See *Gamache*, *supra*, 48 Cal.4th at pp. 377-378 [a reinitiation occurs when the suspect's words or conduct indicate a willingness to engage in a generalized discussion about the investigation].) The record before us indicates defendant's statement about other suspects could fairly be said to represent a desire to start a generalized discussion about the officers' investigation. And, defendant's arguments notwithstanding, for the reasons we have previously explained, the totality of the circumstances before his invocation did not render the implied new waiver of his right to counsel involuntary.

Nor do the circumstances after his reinitiation of the conversation undermine the implied waiver. Shortly after defendant reinitiated the conversation, he said, "I don't know what to do." Deputy Ackerman told defendant, "It's up to you." Defendant responded, "I [want to] help you guys, I want you guys to find him, but I don't want to incriminate myself." Deputy Ackerman replied, "I understand your point." Defendant thereafter continued to respond to the officers' questions, until he later clearly reinvoked his rights once again. Defendant's vague initial statements after the reinitiation were not a clear invocation of his rights, or even sufficient to undermine the implied new waiver arising from his continuing the conversation. The deputy's responses indicated it was defendant's decision as how to proceed, and he chose to continue talking.

Defendant further points to a later moment in the conversation when he said, "I can't talk no more." He contends this constituted an invocation of his right to remain silent that was ignored. Deputy Ackerman responded, however, by offering to get him some more water, implying that defendant was not invoking his right to remain silent, but rather was merely indicating voice problems. And, once again, defendant's followup response, "No, why did I have to rent a video

29

that day?" demonstrated his willingness to continue with the questioning and that he had not intended to invoke his right to remain silent.

Notwithstanding defendant's complaints about his emotional fragility and the officers' deceptive tactics, our independent review of the record discloses nothing during the questioning immediately following the invocation and subsequent waiver to indicate his continued conversation was involuntary.

### 4. *Statements made after defendant stated he did not want to discuss his childhood*

During the fourth section of the questioning, the trial court found defendant's statement he did not want to discuss his childhood to be an invocation of his right to remain silent, which was not honored by the officers. Therefore, the court excluded from the prosecutor's case-in-chief all statements he made thereafter. The court, however, found the statements made during this section of the questioning were voluntary, so it did not exclude them for all purposes.[6] Defendant does not dispute that statements elicited in violation of *Miranda* may be used for impeachment purposes if not truly involuntary. However, he contends the statements made during this section of the questioning were actually involuntary, and therefore should not have been used at trial for any purpose. He points out that, unlike in the earlier portions of the questioning, here he repeatedly invoked his rights to counsel and to remain silent, but his requests were ignored.

---

[6] During this section of the questioning, defendant also again reinvoked his right to counsel, and the questioning stopped for around 20 minutes. The trial court did not expressly rule on the effect of this reinvocation of defendant's right to counsel, presumably because it already had found the statements were made in violation of his right to remain silent, and had excluded them on that basis. As neither party disputes the correctness of the court's exclusion of defendant's statements from this section of the questioning from the prosecutor's case-in-chief, we need not examine defendant's reinvocation of his right to counsel during this section of the questioning.

Lieutenant Bingaman also told defendant he wanted to help him and was "not interested [in] putting [him] behind bars," and that no one was going to "blame a murder on [him]," assertedly implying defendant would receive leniency if he cooperated. Defendant also cites the lateness of the hour and his deteriorating emotional state.

We need not decide, however, whether the trial court abused its discretion in permitting the prosecutor to use for impeachment purposes the statements defendant made after he refused to discuss his childhood, because any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; see *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1133.) Very few of his statements from this portion of the questioning were introduced into evidence at trial. For example, at trial defendant admitted that during the questioning he initially withheld from the investigators the fact that he had rented videotapes from two stores other than the one located in the shopping center from which Piceno was abducted. Defendant also admitted at trial that during the questioning he told the officers he was unsure what he had done immediately after renting the videotapes, which he acknowledged was untrue. To the extent this lack of candor indicated defendant's consciousness of his guilt, it was duplicative of the other, similar evidence that was properly allowed into evidence, such as his statements and demeanor during his interactions with Agent Cacciaroni as well as during other portions of this questioning. In light of the other evidence of defendant's guilt, we are confident these two statements did not impel him to testify at trial, or to testify as he did, and did not prejudicially influence the jury's verdict.

### d. *Jackson's statements*

Defendant contends that the officers arrested him based on information obtained during the questioning conducted in violation of his rights, and, but for

31

this assertedly unlawful arrest, the media would not have published his image, and Jackson would not have come forward and identified him as Piceno's abductor.[7] The trial court, defendant contends, therefore erred by not suppressing Jackson's testimony as the "fruit" of his unlawful statements and arrest.

During the hearing on defendant's motion to exclude his statements and to preclude Jackson from testifying, Lieutenant Bingaman testified about the state of the investigation before the questioning on April 30: Defendant's sister had told the authorities that she thought he might have abducted Piceno; the police knew defendant had rented videotapes from a store near where Piceno had last been seen and he was familiar with the area where Piceno's body had been discovered; and the police had searched defendant's storage unit and found adult-oriented videotapes and magazines. Agent Cacciaroni had informed Lieutenant Bingaman about her interview with defendant, and his demeanor and answers led her to believe that he had "a great deal to hide."

The trial court denied defendant's motion to suppress Jackson's testimony. The court reasoned that, even excising defendant's statements, there was sufficient probable cause for the police to arrest him; specifically, there was evidence that a crime had been committed, defendant had a motive and the opportunity to have committed the crime, and he had exhibited consciousness of guilt. Even assuming the arrest was unlawful, the court ruled defendant's "face" was not suppressible. Citing *United States v. Ceccolini* (1978) 435 U.S. 268 (*Ceccolini*), the court also ruled that Jackson voluntarily came forward as a witness as a result of the media

---

**7**     At the preliminary hearing, Jackson identified defendant as the person who was with Piceno in the Food King parking lot. Jackson testified that he did not contact the police department until a few days after defendant had been arrested and was featured in television and newspaper reports.

32

coverage, and these actions were not sufficiently related to the government's improper conduct during the questioning as to justify suppression.

Defendant contends that without his improperly obtained statements there was no probable cause to arrest him. We need not consider whether probable cause existed to support either defendant's seizure on the ship or the court's issuance of an arrest warrant,[8] however, because Jackson's identification of defendant was sufficiently attenuated as to purge the taint from any assumed impropriety.

"Evidence need not be suppressed as 'fruit of the poisonous tree,' though actually procured as the result of a Fourth Amendment violation against the defendant, if it inevitably would have been obtained by lawful means in any event. [Citation.] Moreover, suppression is not necessarily required *even if* the evidence would not have come to light *but for* an infringement of the defendant's Fourth Amendment rights. [Citation.]

"Rejecting a strict 'but for' test, the United States Supreme Court has admonished that in such cases, 'the more apt question . . . is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." [Citation.]' [Citation.] . . . 'The question is whether the evidence was obtained by the government's exploitation of the illegality or whether the illegality has become attenuated so as to dissipate the taint. [Citation.]' [Citation.]

---

[8] Although the record does not disclose the factual basis for the issuance of the arrest warrant, we assume the trial court at that point relied at least partially on defendant's statements that were later suppressed.

33

"Relevant factors in [the] 'attenuation' analysis include the temporal proximity of the Fourth Amendment violation to the procurement of the challenged evidence, the presence of intervening circumstances, and the flagrancy of the official misconduct.  [Citation.]  Where the testimony of live witnesses is at issue, the test focuses primarily on the effect of the illegality on the witness's willingness to testify, and less on whether illegal conduct led to discovery of the witness's identity.  ([*Ceccolini*, *supra*, 435 U.S. at pp. 276-277].)"  (*Boyer*, *supra*, 38 Cal.4th at pp. 448-449.)

Here, nothing in the record suggests that any assumed illegality of defendant's arrest influenced Jackson's willingness to identify defendant as Piceno's abductor.  Defendant's contention that the news coverage of his arrest alone prompted Jackson to go to the police is insufficient because the exclusion of evidence at a trial is not based on "causation in the logical sense alone." (*Ceccolini*, *supra*, 435 U.S. at p. 274.)  As the high court noted, "The greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means and, concomitantly, the smaller the incentive to conduct an illegal search to discover the witness.  Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet.  Witnesses can, and often do, come forward and offer evidence entirely of their own volition."  (*Id.* at p. 276, fn. omitted.)  Law enforcement played no role in broadcasting the news of defendant's arrest, and Jackson came forward on his own and testified voluntarily.  Accordingly, suppression of his testimony was not required as it was too attenuated from the improper acts that assertedly tainted defendant's arrest.  (See *United States v. Hughes* (1st Cir. 2002) 279 F.3d 86; *State v. Doughty* (Minn. 1991) 472 N.W.2d 299.)

### 3. *Voir Dire Regarding Mitigating Evidence*

Defendant contends the trial court improperly questioned prospective jurors about the role mitigating evidence might play in determining whether to impose the death penalty. We are not persuaded.

During voir dire, the trial court periodically defined mitigating circumstances as something that "could reasonably cause a juror to take into consideration" or "might have some logical or reasonable bearing" when determining the proper punishment, or "might cause a reasonable person to believe that the crime is somehow less morally offensive than it might have otherwise have been." As "extreme" examples of mitigating circumstances, the court described a 75-year-old man who otherwise had led a productive life and a 22-year-old woman who previously had committed a heroic act. At the close of the penalty phase, the court instructed the jury that a "mitigating circumstance is any fact, condition, or event which as such does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty." (CALJIC No. 8.88; see § 190.3, factor (k); CALCRIM No. 763.) Defendant contends the court's statements during voir dire improperly defined mitigating circumstances and lessened the impact of the mitigating evidence that he presented.

The Attorney General preliminarily contends defendant forfeited this issue by failing to object to the trial court's voir dire statements. Even if we were to construe defendant's claim as a challenge to the court's instructions, which we may review under section 1259,[9] this claim lacks merit. The court's examples of

---

[9] "The appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (§ 1259; cf. *People v. Monterroso* (2004) 34 Cal.4th 743, 759.)

35

mitigating circumstances were not legally erroneous, and defendant had the opportunity to educate prospective jurors through his own voir dire questions and comments. (See *People v. Seaton* (2001) 26 Cal.4th 598, 636.) "Moreover, as a general matter, it is unlikely that errors . . . occurring during voir dire questioning will unduly influence the jury's verdict in the case. Any such errors . . . 'prior to the presentation of argument or evidence, obviously reach the jury panel at a much less critical phase of the proceedings, before its attention has even begun to focus upon the penalty issue confronting it.' [Citation.]" (*People v. Medina* (1995) 11 Cal.4th 694, 741.) Indeed, during the penalty phase, the court properly instructed the seated jury on the definition of mitigating circumstances, and to disregard any instructions from those given during the guilt phase that were in conflict with the penalty phase instructions. We presume the jury understood and applied the court's instructions. (*Tully*, *supra*, 54 Cal.4th at p. 1056.)

## B. Guilt Phase

### 1. Admission of Other acts Evidence

Defendant contends the trial court prejudicially erred in admitting assertedly irrelevant and unduly prejudicial evidence of his incestuous conduct with his sister and his possession of adult-oriented material, which would require us to reverse his guilt verdict and death sentence. We disagree.

Utilizing a modified version of CALJIC No. 2.50, at the close of the guilt phase the trial court instructed the jury: "Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial. [¶] Such evidence, if believed, was not received and may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purposes of determining if it tends to

36

show:  The existence of the intent which is a necessary element of a charged crime, or a motive for the commission of a charged crime.  [¶]  For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.  [You are] not permitted to consider such evidence for any other purpose."

All relevant evidence is admissible, but only relevant evidence is admissible.  (Evid. Code, §§ 350, 351.)  A trial court may exclude otherwise relevant evidence if its probative value is substantially outweighed by the probability that its admission will be unduly prejudicial.  (*Id.*, § 352.)  "Prejudice," as used in Evidence Code section 352, is not synonymous with damaging.  (*People v. Coddington* (2000) 23 Cal.4th 529, 588.)  Rather, it refers to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual, and has little to do with the legal issues raised in the trial.  (*Ibid.*)

Character evidence, sometimes described as evidence of propensity or disposition to engage in a specific conduct, is generally inadmissible to prove a person's conduct on a specified occasion.  (Evid. Code, § 1101, subd. (a).)  Evidence that a person committed a crime, civil wrong, or other act may be admitted, however, not to prove a person's predisposition to commit such an act, but rather to prove some other material fact, such as that person's intent or motive.  (*Id.*, § 1101, subd. (b).)  In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense is not barred by Evidence Code section 1101, provided such evidence is not excludable under section 352.  (*Id.*, § 1108, subd. (a).)  Unlike evidence admitted under Evidence Code section 1101, subdivision (b), evidence of uncharged sex crimes admitted under Evidence Code section 1108 may be used in a sex offense prosecution to demonstrate the defendant's disposition to commit such crimes.  (See *People v. Reliford* (2003) 29 Cal.4th 1007, 1009.)  We review for an abuse of

37

discretion the trial court's rulings on the admissibility of evidence. (*Riggs*, *supra*, 44 Cal.4th at p. 290.)

### a. Incestuous conduct

Before the start of the trial, the trial court initially ruled evidence of defendant's incestuous conduct with his sister would be admissible to demonstrate the identity of Piceno's abductor as well as defendant's potential motive for abducting her. Defendant contends the court abused its discretion by admitting some evidence of his incestuous conduct under Evidence Code section 1108. However, we need not consider the merits of the court's initial ruling, nor the Attorney General's related argument that defendant forfeited this issue on appeal by not properly objecting in the trial court. There is no possibility the jury considered evidence of defendant's incestuous conduct as mere proof of propensity or bad character under Evidence Code section 1108: Although the court initially ruled some evidence of defendant's incestuous conduct was admissible under this provision, it ultimately instructed the jury that evidence of other crimes was relevant only to prove motive or intent. The court specifically instructed the jury the evidence of defendant's other crimes could not be considered as evidence of his bad character or propensity to commit the charged crimes. We presume the jurors understood and followed the court's instruction. (*Tully*, *supra*, 54 Cal.4th at p. 1055.) Moreover, the parties did not discuss this evidence in the context of establishing defendant's propensity to commit a sexual crime as proof of his guilt of the charged offenses and allegations.[10]

---

[10]    The prosecutor explained to the jury the trial court's use of the phrase "prior criminal activity" meant the incestuous conduct. The prosecutor stated evidence of defendant's incestuous conduct could not be used to show that defendant was "more likely to be guilty in this case than not."

Defendant next contends the trial court abused its discretion in instructing the jury it could consider evidence of other crimes, that is, his incestuous conduct, for the limited purpose of determining his intent or motive with respect to the charged crimes because the crimes were not sufficiently similar.  Evidence Code section 1101, subdivision (b), points out that uncharged conduct can be relevant and admissible to prove some fact other than propensity, such as motive or intent. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 401-402 (*Ewoldt*).)  "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent.  [Citation.]  '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish . . . the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.]  In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*Id.* at p. 402; see *People v. Demetrulias* (2006) 39 Cal.4th 1, 15 [probative value of uncharged conduct as evidence of motive does not necessarily depend on the similarities between the charged and uncharged conduct, provided there is a direct logical nexus].)

Defendant was charged with violating subdivision (b) of section 207, which prohibits kidnapping for the purpose of committing an act prohibited by section 288.  Subdivision (a) of section 288 prohibits willfully and lewdly committing "any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child . . . ."  As noted, Piceno was eight years old when she was abducted; defendant was 35 years old.

When defendant's sister was three years old and he was five, he put his hand down her pants and fondled her. This behavior occurred several times a week and eventually became an almost daily occurrence. At some point after his sister turned five, defendant would climb in her bed, take off his underwear and hers, lie on top of her, and simulate intercourse. Defendant tried to place his sister's hand down the front of his pants. When his sister was nine or 10 years old, defendant started to have erections and asked her if he could penetrate her, and sometimes tried to. When defendant was 12 or 13, he started to fondle his sister's breasts and try to kiss her. After defendant obtained his driver's license, one time he drove his sister to a remote area, and, after initially resisting, she performed oral sex on him for a few seconds. By the time his sister was 15, the abuse was less frequent, and defendant stopped sexually abusing her when she was 16 or 17 years old. And, as noted, defendant as an adult once told his sister that one of the reasons he never married was he feared he might molest his own children.

Defendant first contends evidence of this uncharged conduct was not admissible to prove intent or motive because the fundamental issue of the identity of Piceno's abductor was in dispute. Not so. The admission of evidence of the perpetrator's intent requires neither the defendant to concede identity nor the trial court to assume that the defendant committed both sets of acts. There must be sufficient evidence for the jury to find defendant committed both sets of acts, and sufficient similarities to demonstrate that in each instance the perpetrator acted with the same intent or motive. (*People v. Foster* (2010) 50 Cal.4th 1301, 1332 (*Foster*); see *People v. Rogers* (2013) 57 Cal.4th 296, 330-331 (*Rogers*).)

Defendant next contends evidence of his incestuous conduct was not sufficiently similar to the charged offenses and should have been excluded as irrelevant. Defendant points out various differences between the crimes: Unlike his sister, Piceno was not a relative; Piceno was abducted by a stranger; he

40

molested his sister when he was young, and most of the acts occurred while he was a minor; and he molested his sister well past Piceno's age at the time of her abduction, assertedly implying he was attracted only to his sister and not to young girls generally.

Evidence of defendant's molesting his sister, however, was relevant to prove intent, as the acts he committed against her were proscribed by section 288. In other words, it would not be speculative to infer that, because he had committed lewd acts against his sister when she was a child, he abducted Piceno with the intent to a commit a lewd act against her.

We are not persuaded that the differences between the crimes rendered evidence of the incestuous conduct inadmissible as irrelevant, as the requisite mental states were sufficiently similar, and the differences between the crimes went to the weight, if any, the jury assigned to the evidence. (See *People v. Edwards* (2013) 57 Cal.4th 658, 712 (*Edwards*).) Although defendant contends his molesting his sister demonstrates that he was attracted only to her, his statement as an adult that he feared he might molest his own children reasonably could have been interpreted to mean his desire was not limited to just his sister, thus making his incestuous conduct relevant to his intent or motive when he abducted Piceno.

Defendant next contends the trial court abused its discretion in not excluding evidence of his incestuous conduct as unduly prejudicial under Evidence Code section 352. " 'Evidence is prejudicial within the meaning of Evidence Code section 352 if it " 'uniquely tends to evoke an emotional bias against a party as an individual' " [citation] or if it would cause the jury to " ' "prejudg[e]" a person or cause on the basis of extraneous factors' " [citation].' [Citation.]" (*Foster*, *supra*, 50 Cal.4th at p. 1331.) Generally, due to the potential undue prejudice inherent in

41

uncharged offenses, evidence of their occurrence is admissible only if it has substantial probative value.  (*Ibid.*)

When determining the prejudicial impact of other sexual offenses admitted under Evidence Code section 1108, the trial court may consider the "nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.  [Citations.]" (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*).)  As we have indicated, however, the jury was specifically instructed to consider defendant's incestuous conduct only for motive and intent, and thus cannot have used it as evidence of his propensity to commit sex offenses.  Nonetheless, as we will explain, the above listed factors help us conclude that the trial court did not abuse its discretion in admitting the evidence of defendant's incestuous conduct.

Defendant contends he was unduly burdened by having to defend against the molestation allegations, but at trial he admitted the incestuous acts occurred.  (See *Falsetta*, *supra*, 21 Cal.4th at p. 916.)  Defendant also contends the molestation evidence unduly sidetracked his trial, but his sister's testimony was relatively brief, as was his own testimony about the incestuous conduct.  (See *ibid.*)

Defendant notes that he was never convicted of molesting his sister, which might have made the jury inclined to punish him for the uncharged crimes.  (See *Ewoldt*, *supra*, 7 Cal.4th at p. 405.)  But the evidence of defendant's incestuous conduct, while undoubtedly disturbing, was less inflammatory than the evidence about the charged offenses.  (See *ibid.*)

42

Defendant also contends the incestuous conduct was too remote in time. (See *Ewoldt*, *supra*, 7 Cal.4th at p. 405.) As noted, defendant started to molest his sister around 30 years before Piceno was abducted, and the molestations ended around 17 years before the abduction. No specific time limit exists as to when an uncharged crime is so remote as to be excludable. (E.g., *People v. Robertson* (2012) 208 Cal.App.4th 965, 992-994 [upholding admission of sex crime that was committed 30 years before the charged crime]; *People v. Branch* (2001) 91 Cal.App.4th 274, 284-285 [same]; *People v. Waples* (2000) 79 Cal.App.4th 1389, 1392-1395 [continuous molestation occurring between 18 to 25 years before the charged crimes]; *People v. Soto* (1998) 64 Cal.App.4th 966, 977-978, 991-992 [victims were the defendant's sister and niece; continuous molestation occurring between 22 or 23 years to 29 or 30 years before the charged crimes, and additional molestation 21 or 22 years before the charged crimes].) Here, given defendant's concern that he might molest his own children, it would appear his sexual interest in young girls persisted despite the long passage of time. Moreover, evidence that defendant had molested his sister when she was eight years old (Piceno's age when she was abducted), even though he was only 10 years old at the time, was highly probative of his intent during the kidnapping, and may have balanced out the temporal remoteness. We therefore cannot say the molestation was too remote.

Defendant further contends the risk of prejudice could have been lessened, noting that he offered to stipulate that whoever abducted Piceno did so for the purpose of sexual molestation, which, he contends, would have rendered the evidence of his incestuous conduct unnecessarily cumulative. Neither the prosecutor nor the trial court, however, was required to accept his proffered stipulation. (*Rogers*, *supra*, 57 Cal.4th at pp. 329-330.)

Defendant additionally contends the probative value of the incestuous conduct was diminished because its source, that is, his sister, was the first person to suspect he had abducted Piceno. (See *Ewoldt*, *supra*, 7 Cal.4th at p. 404 ["The probative value of evidence of uncharged misconduct also is affected by the extent to which its source is independent of the evidence of the charged offense."].) Defendant, however, admitted that he had molested his sister. The possibility that his sister, upon learning of Piceno's disappearance, fabricated the molestation is obviated by defendant's admission that the conduct occurred.

Defendant finally contends much of the conduct occurred when he was younger than 14 years old and therefore it should have been presumed that he was too young to be capable of a committing a crime. (See § 26, subd. One; cf. *People v. Cottone* (2013) 57 Cal.4th 269, 280-281 [evidence relevant under Evid. Code § 1108 is limited to crimes, which includes evidence of the capacity to appreciate the wrongfulness of the conduct, as required by section 26].) Defendant's incestuous conduct, however, was relevant under Evidence Code section 1101, subdivision (b), which is not limited to evidence of criminal conduct, but may encompass any wrong or other act.[11] Thus, to the extent the jury considered the incestuous conduct defendant committed when he was younger than 14 years old as relevant to his intent or motive when he abducted Piceno, it was not improper for it to do so.

---

[11] Although Evidence Code section 1101, subdivision (b), refers to "a crime, civil wrong, or other act," the trial court here only instructed the jury that it could consider evidence of "other crimes" as probative of his intent or motive; the court did not instruct the jury about other acts that might have not amounted to a crime.

44

### b. Possession of adult-oriented material

Before the start of the trial, the trial court ruled evidence that defendant rented nine adult-oriented videotapes on the day of Piceno's abduction was relevant to demonstrate his interest or preoccupation with "his sexual passions at the time in question." During the trial and outside the presence of the jury, the court also ruled evidence relating to defendant's possession of adult-oriented magazines that focused on teenaged women who were staged to appear younger than their actual ages was probative of his motive and not unduly prejudicial.

The jury heard Deputy Ackerman's testimony about the adult-oriented magazines found in defendant's storage unit. None of the "several dozen" models were prepubescent children. Some of the magazines claimed to have models as young as 16 years old, and some of them appeared to Deputy Ackerman to be that young, but none of their actual ages were investigated. The text accompanying some of the models referred to them as still growing or not being fully developed. The vast majority of the models had fully developed or nearly fully developed breasts. Between five and 10 of the models had shaved genitalia. At most, six models had their hair in a ponytail or pigtails; at least one model had a ribbon in her hair. A minority of the models were posed with stuffed animals or other toys.

Defendant contends the trial court committed prejudicial error by admitting evidence of his possession of the adult-oriented magazines because they were irrelevant and unduly prejudicial.[12] Defendant concedes his renting of videotapes

---

[12] In light of our rulings with regard to Evidence Code section 1108 and the trial court's instruction regarding the "other crime" evidence that was presented at trial, we reject defendant's contention the jurors might have considered his lawful possession of adult-oriented material as evidence of his bad character or disposition to commit crimes. (See *People v. Wilson* (2005) 36 Cal.4th 309, 327-328 [the defendant suffered no prejudice from the failure to define the other crimes evidence]; Evid. Code, § 355 [upon request, the trial court shall restrict the

*(footnote continued on next page)*

45

was relevant to Piceno's abduction, as it helped establish his proximity to the crime; he contends evidence of their adult nature should not have been admitted. The admission of this evidence did not cause reversible error.

In *People v. Memro* (1995) 11 Cal.4th 786 (*Memro*), the defendant was charged with first degree murder. Among the bases for the charge was a felony-murder theory that one of the victims was killed during the commission or attempted commission of a lewd act on a child under 14 years old. The defendant told law enforcement he enjoyed taking pictures of young boys in the nude and brought one of the victims to his apartment to take some photographs. (*Id.* at p. 812.) Over the defendant's objection, the trial court allowed into evidence his magazines and photographs that depicted clothed and unclothed youth, reasoning they were relevant to his motive and intent to perform a lewd act on the victim he had taken home. (*Id.* at p. 864.) We ruled the magazines and photographs were admissible as relevant evidence of the defendant's intent to commit a lewd act because the jury could have inferred from his possession of them that he had a sexual attraction to young boys and intended to act on that attraction. (*Id.* at pp. 864-865.) We also ruled the court did not abuse its discretion in finding the magazines and photographs, which contained some material that most people would find disturbing, were not substantially more unduly prejudicial than probative. (*Id*. at p. 865.) Although defendant contends *Memro* was wrongly decided because the magazines and photographs did not depict the actual victim,

---

*(footnote continued from previous page)*

evidence to its proper scope if it was admitted for a limited purpose].) In any event, the prosecutor argued to the jury that defendant's consumption of adult-oriented material was relevant to his intent or motive, and nothing in the record suggests the jury might have considered it for another purpose.

we are not persuaded we should revisit the general principle that evidence of possession of adult-oriented material may be relevant and not unduly prejudicial under some circumstances.

In *People v. Page* (2008) 44 Cal.4th 1, 5 (*Page*), the defendant was charged with the first degree murder and commission of a lewd act on a child, in violation of section 288. The trial court admitted into evidence 55 adult-oriented magazines found in the defendant's bedroom.[13] (*Page*, at p. 13.) Notably, two of them, like some of the ones here, focused on teenaged women who were staged to appear younger than their actual ages; another one depicted acts of bondage and sadomasochism. (*Ibid.*) The defendant objected to the admission of these three magazines. We noted the two magazines focusing on young women may have been probative, that is, relevant and therefore admissible, of the defendant's commission of the crimes. (*Id.* at p. 40.) We expressed concern, however, that they had less probative value than those in *Memro* because the *Page* magazines' models were not staged to appear as young as the victim, and, unlike in *Memro*, the defendant did not produce child pornography. (*Page*, at p. 40.) In addition, no magazine in *Page* contained a photograph of the victim; although the cover model on one of these magazines resembled the victim, she was only one of the many models who appeared in the defendant's magazine collection. (*Id.* at pp. 40-41.) We also doubted the probative value of the magazine that focused on bondage and sadomasochism because its depictions of violence were not similar to the violent acts committed against the victim. (*Ibid.*) After acknowledging the propriety of

---

[13] The trial court in *Page* also admitted into evidence the titles and brief descriptions of 58 additional adult-oriented magazines found in the defendant's apartment, as well as a list of the titles of 550 adult-oriented movies also found there.

47

admitting evidence of a defendant's adult-oriented material is case specific, we ultimately declined to decide whether the court had abused its discretion by not excluding the magazines under Evidence Code section 352, and instead held the defendant failed to demonstrate prejudicial error from the admission of this evidence because the other evidence of his guilt was overwhelming. (*Page*, at pp. 41-46.)

In this case, evidence of defendant's adult-oriented magazines and videotape rentals was relevant because there was a rational connection between his possession of this material and his intent and motive when he abducted Piceno. (See *Memro*, *supra,* 11 Cal.4th at pp. 864-865; Evid. Code, § 210 [" 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."].) The danger of undue prejudice, however, arguably may have substantially outweighed the probative value of the adult-oriented material because the jury was told the material here tended to focus on young women staged to look younger, but no one depicted was staged to appear as young as Piceno; Piceno herself appeared neither in any of defendant's magazines nor on the videotapes he had rented; and defendant did not create child pornography.

But even were we to assume the trial court abused its discretion in not excluding under Evidence Code section 352 defendant's possession of adult-oriented material, it is not reasonably probable he would have achieved a more favorable outcome in the absence of any assumed error. (See *People v. Watson* (1956) 46 Cal.2d 818, 836; *Page*, *supra*, 44 Cal.4th at pp. 41-42; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1125.) In light of the evidence of the pervasive acts of child molestation that defendant *committed*, evidence of his *possession* of adult-oriented material was not especially significant in comparison; the mere possession of such material did not give rise to a strong inference that the

48

possessor was actually motivated to molest children. The persuasive value of the evidence of defendant's acts of molestation was substantial, as he actually committed those acts — acts proscribed by section 288. In contrast, his consumption of adult-oriented material was less probative because many who consume such material are not motivated to then molest children. Thus, even assuming the trial court erred in admitting evidence of the adult-oriented material, it was ultimately cumulative to and overshadowed by the other, more powerful evidence of his intent or motive, that is, his acts of child molestation.

Moreover, the adult-oriented material was not central to the prosecutor's case. The prosecutor only briefly referenced the adult-oriented material during his closing argument. And the jury here was only told the titles of the magazines and videotapes and the contents were only generally described, whereas the jury in *Page* was permitted to view the 55 adult-oriented magazines.

Admittedly, defendant's consumption of adult-oriented material was less remote in time than his incestuous conduct. And the introduction of the adult-oriented material permitted Deputy Ackerman to testify about its importance. Some jurors might have found distasteful the evidence of defendant's interest in adult-oriented material focused on young women.

But we are confident any such possible discomfort did not prevent the jurors from basing their determinations on the evidence of defendant's guilt. Defendant was identified as the person who took Piceno, a young girl, from the shopping center. A shower curtain resembling his was found near Piceno's body. He does not dispute that he was in the vicinity of Piceno's abduction and was familiar with the area where her body was found. Defendant repeatedly exhibited behavior that could have been construed as manifestations of his guilt. And we have already determined the court did not abuse its discretion in admitting evidence of incestuous conduct as probative evidence of his intent.

In addition, defendant's efforts to undermine the prosecutor's evidence were not particularly strong. Although he attempted to highlight some of the discrepancies in the testimony of the prosecutor's witnesses, none of his evidence contradicted the case against him. There were some similarities between Piceno's murder and Angelica R.'s, but defendant, at best, established that he did not kill Angelica R. Any possible similarities between the two crimes did not exonerate defendant of Piceno's death. Excluding the adult-oriented material would not have altered the jury's calculus in assessing the strength of his evidence.[14]

### 2. *Sufficiency of the Evidence*

Defendant contends there was insufficient evidence to support his conviction for kidnapping for the purpose of committing a lewd act on a child under 14 years old. The contention lacks merit.

The applicable law is settled. " 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'

---

[14] Similarly, there is no reasonable possibility the jury would have reached a different outcome during the penalty phase if this evidence had not been admitted during the guilt phase. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 674.)

To the extent defendant contends his First Amendment rights were violated because his lawful possession of adult-oriented material was used against him, he did not raise this objection in the trial court and therefore has not preserved it for appellate review. (*Memro*, *supra*, 11 Cal.4th at p. 865.)

[Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" (*Edwards*, *supra*, 57 Cal.4th at p. 715.) " ' "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.]" ' " (*Tully*, *supra*, 54 Cal.4th at p. 1006.)

"Every person, who for the purpose of committing any act defined in Section 288, hires, persuades, entices, decoys, or seduces by false promises, misrepresentations, or the like, any child under the age of 14 years to go out of this country, state, or county, or into another part of the same county, is guilty of kidnapping." (§ 207, subd. (b).) Subdivision (a) of section 288 prohibits willfully and lewdly committing "any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child . . . ."

Defendant does not challenge the sufficiency of the evidence demonstrating that he took Piceno; rather, he contends there was insufficient evidence that he did so for the purpose of committing a lewd act.[15] As noted, Piceno's body was found fully clothed. The pathologist who performed the autopsy could not locate Piceno's hymen, but conceded that decomposition might have caused its absence.

---

[15]    Subdivision (a) of section 207 prohibits, in pertinent part, the taking of a person by use of force or any other means to instill fear. Subdivision (b) does not require that the victim be taken by means of force or fear; this subdivision may be violated if the perpetrator hires, persuades, entices, decoys, or seduces by false promises or misrepresentations the victim.

    Defendant on appeal does not challenge the sufficiency of the evidence of his conviction for violating section 207, subdivision (a); he does not claim there was insufficient evidence that he took Piceno by employing force or fear.

51

Nonetheless, the evidence as a whole was sufficient to permit a rational juror to find that defendant harbored a lewd purpose when he took her. Throughout his childhood, defendant engaged with incestuous conduct with his younger sister. Defendant later told his sister that one of the reasons he never married was he feared he might molest his own children. Defendant contends this evidence does not demonstrate that he as an adult had a generalized sexual interest in prepubescent girls, but we are satisfied a rational juror could have concluded otherwise.

Although there was no indication of sexual trauma on Piceno's fully clothed body, that alone does not compel the conclusion defendant had no lustful intent when he abducted her. It is possible that defendant intended, and perhaps accomplished, a lewd act that would not have involved undressing the victim or causing sexual trauma to her body. And given the passage of time between Piceno's disappearance and the discovery of her body, evidence of sexual trauma may have disappeared as the body decomposed. (See *People v. Rundle* (2008) 43 Cal.4th 76, 139.) Moreover, a conviction under section 207, subdivision (b), does not require a defendant to actually commit a lewd act, or even attempt to commit one; its focus is on the perpetrator's intent at the time of the abduction. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 163-164 [absence of evidence establishing a completed rape does not preclude a finding of attempted rape].)

### 3. Jury Instructions

#### a. Other crimes evidence

Defendant contends the trial court's other crimes instructions impermissibly lessened the burden of proof required to convict him of the crimes for which he was on trial. We disagree.

As noted, the trial court instructed the jury with a modified version of CALJIC No. 2.50, which described its limited ability to consider evidence of other crimes that defendant may have committed. The court also instructed the jury with a modified version of CALJIC No. 2.50.1 as follows: "Within the meaning of [CALJIC No. 2.50], such other crime or crimes purportedly committed by a defendant must be proved by a preponderance of the evidence. You must not consider this evidence for any purpose unless [you are] satisfied that the defendant committed such other crimes. [¶] The prosecution has the burden of proving these facts by a preponderance of the evidence."

"It is well settled that evidence of other crimes presented in the guilt phase of a criminal trial may be proved by a preponderance of the evidence." (*Rogers*, *supra*, 57 Cal.4th at p. 338.) The trial court's instructions to the jury pursuant to CALJIC Nos. 2.50 and 2.50.1, when considered in conjunction with its instructions pursuant to CALJIC Nos. 2.01 (sufficiency of circumstantial evidence) and 2.90 (presumption of innocence, reasonable doubt, prosecution's burden of proof), did not diminish defendant's presumption of innocence or the prosecutor's burden of proving defendant's guilt beyond a reasonable doubt.[16] (*Rogers*, *supra*, 57 Cal.4th at pp. 338-339.)

### b. First degree murder

Defendant contends the trial court erroneously instructed the jury that it could find him guilty of first degree murder because he was charged in the information

---

[16] Defendant's reliance on *Gibson v. Ortiz* (9th Cir. 2004) 387 F.3d 812 is misplaced because the trial court here did not instruct the jury with CALJIC No. 2.50.01, which, with CALJIC No. 2.50.1, the *Gibson* court concluded, had improperly "permitted the jury to 'infer that the defendant committed the charged crime if it found "that the defendant committed a prior sexual offense." ' [Citation.]" (*Rogers*, *supra*, 57 Cal.4th at p. 339, fn. 8.)

only with "malice murder" under section 187 and not first degree murder under section 189.

We have repeatedly rejected this contention and have concluded that a defendant may be convicted of first degree murder even if charged only with murder with malice in violation of section 187. (*Tate*, *supra*, 49 Cal.4th at pp. 696-697; see *People v. Jones* (2013) 57 Cal.4th 899, 968-969.) We do so again here.

### c. *Reasonable doubt*

Defendant contends several standard jury instructions lessened the prosecutor's burden to prove guilt beyond a reasonable doubt. Specifically, defendant cites CALJIC Nos. 1.00 (respective duty of judge and jury), 2.02 (sufficiency of circumstantial evidence to prove specific intent or mental state), 2.21.2 (witness willfully false), 2.22 (weighing conflicting testimony), 2.27 (sufficiency of testimony of one witness), 2.51 (motive), 8.83 (sufficiency of circumstantial evidence to prove a special circumstance), and 8.83.1 (sufficiency of circumstantial evidence to prove mental state). We have rejected similar challenges to these instructions. (*Tate*, *supra*, 49 Cal.4th at p. 698.) Defendant acknowledges our previous holdings, but he presents no compelling reason for us to revisit them.

### 4. *Denial of Motion for New Trial*

Defendant contends the trial court abused its discretion in denying his motion for a new trial based on evidence discovered between the guilt and penalty phases.

As noted, during the guilt phase defendant presented evidence of the disappearance and murder of 10-year-old Angelica R. Defendant also presented evidence that he did not abduct and kill her, that is, he was not in California when she disappeared, and he was excluded as the donor of the sperm recovered from

her body.  Defendant highlighted the similarities between the crimes committed against Piceno and Angelica R., and argued to the jury that whoever killed Angelica R. also killed Piceno.

A few days after the jury convicted defendant, the prosecutor disclosed that a Donald Bales had just confessed to killing Angelica R.  When questioned by law enforcement about Piceno's disappearance, Bales initially denied any involvement, then confessed to abducting and killing her, but almost immediately recanted.  Bales also accused a person other than defendant of killing Piceno and Angelica R.  At an evidentiary hearing on defendant's motion for a new trial, Bales asserted his constitutional privilege against self-incrimination.

At the evidentiary hearing, defendant made an offer of proof that Bales's statements about Angelica R.'s abduction and killing were accurate.  The prosecutor made offers of proof that law enforcement coerced Bales's statements about Piceno; that DNA evidence excluded him as being Angelica R.'s killer; that he had an IQ in the mid-70s, indicating possible intellectual disability; and that some of his statements about Angelica R. were wrong.  The trial court reviewed recordings of Bales's questioning.

The trial court denied defendant's motion for a new trial, ruling Bales's statements to law enforcement about Piceno were involuntarily made and therefore inadmissible.  The court also sustained the prosecutor's hearsay and relevance objections to his statements.

A criminal defendant may move for a new trial based on newly discovered evidence.  (§ 1181, subd. 8.)  " ' "We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard."  [Citations.]  " 'A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and

55

unmistakable abuse of that discretion.' " ' [Citation.]" (*People v. Lightsey* (2012) 54 Cal.4th 668, 729 (*Lightsey*).)

Defendant contends the trial court abused its discretion in excluding Bales's statements as inadmissible hearsay. Hearsay is an out-of-court statement that is offered for the truth of the matter asserted, and is generally inadmissible. (Evid. Code, § 1200.) An extrajudicial declaration against the declarant's penal interest, however, is admissible as an exception to the hearsay rule. (*Id.*, § 1230.) " 'The proponent of such evidence must show "that the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." ' [Citation.] 'The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citations.] In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.] . . . [¶] A trial court's decision to admit or exclude evidence is a matter committed to its discretion ' "and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' [Citation.]" (*People v. Geier* (2007) 41 Cal.4th 555, 584-585, overruled on other grounds by *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305.)

The trial court did not abuse its discretion in excluding Bales's extrajudicial statements as hearsay. It is undisputed that Bales's statements were against his penal interest and his invocation of his privilege against self-incrimination at the evidentiary hearing made him unavailable as a witness. (See Evid. Code, § 240, subd. (a)(1).) Turning to reliability, we agree with the court's finding that Bales's

56

statements were unreliable. One of the more obvious indicators of their unreliability was the circumstance that Bales initially denied abducting Piceno, then confessed to doing so, and then almost immediately recanted. In addition, the court found the officers employed coercive tactics when they questioning Bales. For example, the officers told Bales that if he did not cooperate and show remorse, he would be facing the death penalty. This and similar other statements by law enforcement supported the court's finding of unreliability. Although defendant contends the court erred in finding this coerciveness rendered Bales's statement involuntary, that is ultimately a separate issue from whether the statements were unreliable due to coercion, or other factors.

Defendant attempts to highlight the overall reliability of Bales's statements, such as the accuracy of his statements about Angelica R. Whether the reliability of Bales's statements about Angelica R. demonstrates the reliability of his statements about Piceno is debatable. Even assuming such an inference could be drawn, the totality of the circumstances of the questioning — including the coercive tactics, and the inaccuracies and changes in Bales's statements — show the trial court did not abuse its discretion in concluding defendant failed to demonstrate the reliability of Bales's statements regarding Piceno.

Because the trial court did not abuse its discretion in excluding Bales's statements as hearsay, we need not examine either its alternative bases for excluding them or defendant's claims of prejudice. The court accordingly was correct in denying defendant's motion for a new trial because he presented no admissible evidence that probably would have resulted in a different verdict. (See *People v. Delgado* (1993) 5 Cal.4th 312, 328; cf. *Chambers v. Mississippi* (1973) 410 U.S. 284, 302 (*Chambers*) [a defendant's federal due process right could be violated by the application of the hearsay rule to exclude critical defense evidence

57

that "bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest"].)

### C. Exclusion of Evidence of a Third Party Confession During Penalty Phase

In conjunction with his motion for a new trial, defendant also sought to introduce Bales's statements as evidence in mitigation during the penalty phase, and contends the trial court erred by preventing him from presenting this evidence.

At a capital penalty trial, lingering doubts about a defendant's guilt constitute a proper factor in mitigation of the penalty. (*People v. Thomas* (2013) 53 Cal.4th 771, 826.) Generally, only competent (that is, admissible) evidence may be introduced during the penalty phase. (*People v. Gay* (2008) 42 Cal.4th 1195, 1219-1220.) And, as we have discussed, the trial court did not abuse its discretion in ruling that Bales's statements were inadmissible hearsay.

Defendant nonetheless contends he has a federal constitutional right to present otherwise inadmissible hearsay evidence during the penalty phase. In *Chambers*, the high court held the exclusion of a third party's confession to the crime for which the defendant was being prosecuted may violate the constitutional right to present witnesses in his or her defense. (*Chambers, supra*, 410 U.S. at p. 302.) The federal Constitution, however, does not generally create a code of evidence that supersedes a state's evidentiary rules in capital sentencing proceedings. (See *Edwards*, *supra*, 57 Cal.4th at p. 759.) Rather, hearsay evidence during a penalty phase may not be excluded if " '(1) the excluded testimony is "highly relevant to a critical issue in the punishment phase of the trial," and (2) there are substantial reasons to assume the reliability of the evidence.' [Citation.]" (*Id.* at p. 760.) Here, the trial court expressly found Bales's statements were unreliable. Accordingly, the court did not abuse its discretion in excluding Bales's statements from the penalty phase. (See *Lightsey*,

*supra*, 54 Cal.4th at pp. 716-717 [trial court excluded defendant's alleged statements because they lacked persuasive assurances of trustworthiness and were not critical to his defense].)

### D. Constitutional Challenges to the Death Penalty

Defendant raises numerous challenges to California's death penalty statute and to the standard instructions given during the penalty phase. We have rejected these claims on many occasions, and defendant presents no compelling reason for us to revisit them.

" '[T]he death penalty statute is not unconstitutional because it does not require "unanimity as to the truth of aggravating circumstances, or findings beyond a reasonable doubt that an aggravating circumstance (other than § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." [Citation.] Nothing in . . . *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, or *Apprendi v. New Jersey* (2000) 530 U.S. 466, affects our conclusions in this regard. [Citations.] No burden of proof is constitutionally required, nor is the trial court required to instruct the jury that there is no burden of proof. [Citations.] . . . The trial court need not instruct that there is a presumption of life. [Citation.]' [Citation.]

"Moreover, the statute is not unconstitutional because the special circumstances it specifies are so numerous or broad that it fails to genuinely narrow the class of persons eligible for the death penalty, or because it fails to require written findings. [Citations.] Section 190.3, factor (a), which allows the jury to consider the circumstances of the capital crime in aggravation, is not impermissibly overbroad and does not lead to arbitrary or capricious imposition of the death penalty. [Citations.] The federal constitutional guarantees of due

59

process and equal protection, and against cruel and unusual punishment (U.S. Const., 6th, 8th, & 14th Amends.), do not require intercase proportionality review on appeal. [Citation.]

"CALJIC No. 8.88 is not impermissibly overbroad, vague, or misleading insofar as it specifies that the jury may impose death if persuaded the aggravating circumstances are 'so substantial' in comparison to the mitigating circumstances that death is 'warrant[ed],' and fails to advise that the central determination is whether death is the 'appropriate' penalty. [Citations.] Nor was the trial court required to delete inapplicable sentencing factors from the penalty instructions. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1057-1058 (*Mai*).) "We have . . . repeatedly considered and rejected attacks on the constitutionality of CALJIC Nos. 8.85 and 8.88. [Citation.]" (*Tully*, *supra*, 54 Cal.4th at p. 1069.)

The instructions need not inform the jury regarding the standard of proof and lack of need for unanimity as to mitigating circumstances. (*Rogers*, *supra*, 57 Cal.4th at p. 349.) The trial court need not inform the jury that " 'statutory mitigating factors were relevant solely as potential mitigators.' " (*Id.* at p. 350.)

Equal protection does not require California to adopt procedural rules available to capital defendants in other jurisdictions. (*People v. Hawthorne* (1992) 4 Cal.4th 43, 77.)

"Finally, California's death penalty scheme does not violate international law and norms. [Citation.] We are not persuaded otherwise by *Roper v. Simmons* (2005) 543 U.S. 551, in which the high court cited evolving international standards as 'respected and significant' support for its holding that the Eighth Amendment prohibits imposition of the death penalty against persons who committed their crimes *as juveniles*." (*Mai*, *supra*, 57 Cal.4th at p. 1058.)

60

### E.  Cumulative Error

Defendant contends the errors he alleges cumulatively amounted to reversible error.  To the extent there are instances in which we have found error or assumed its existence, no prejudice resulted.  We reach the same conclusion after considering their cumulative effect.

### III.  CONCLUSION

We affirm the judgment.

BAXTER, J.


WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.
RAMIREZ, J.*

---

\*  Presiding Justice of the Court of Appeal, Fourth Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. McCurdy

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S061026
**Date Filed:** August 14, 2014

_____

**Court:** Superior
**County:** Kings
**Judge:** Peter M. Schultz

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Gary D. Garcia, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Kamala D. Harris, Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Stan Cross, Acting Assistant Attorney General, Carlos A. Martinez, Patrick J. Whalen and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gary D. Garcia
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607-4139
(510) 267-3300

Catherine Tennant Nieto
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 323-6307