Filed 11/3/15  P. v. Fulkerson CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KEVIN RONALD FULKERSON,<br><br>    Defendant and Appellant. | E061903<br><br>(Super.Ct.No. SWF1401222)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Ronald L. Taylor, Judge. (Retired Judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Buckley & Buckley, and Christian C. Buckley, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Kimberley A. Donohue, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted defendant and appellant Kevin Ronald Fulkerson of attempted voluntary manslaughter (Pen. Code, §§ 664/192)[1] as a lesser included offense to the charge of attempted murder.  The jury also found true an allegation that defendant inflicted great bodily injury on the victim.  (§ 12022.7, subd. (a).)  Defendant personally admitted that he had suffered a prior conviction for voluntary manslaughter in the state of Ohio and that the conviction constituted both a "strike" and a "serious felony conviction" within the meaning of sections 667, subds. (a)(1) and (b)-(i), and 1170.12.  Defendant was sentenced to a total of 14 years in prison.

On appeal, defendant's sole contention is that there was insufficient evidence because the prosecution failed to prove beyond a reasonable doubt that defendant did not act out of a reasonable belief that his actions were necessary in self-defense.  We disagree, and affirm the judgment.

STATEMENT OF FACTS

Defendant and the victim, Steven Cook, were neighbors, separated by one or two lots.  At some point Cook sold defendant a computer with the plan that defendant would sign up for Internet service and Cook could access the Wi-Fi connection from outside defendant's home.  At this time the two men were getting along well.

However, according to Cook's testimony, by the time of the subject shooting there were bad feelings between them because defendant had borrowed some tools from Cook and refused to return them.  There had also been an incident in which defendant "rode his

---

[1] All subsequent statutory references are to the Penal Code.

motorcycle up to my house, jumped off and aggressively came at me." This was apparently due to Cook's objections over defendant's fast and noisy approach on his Harley-Davidson. When defendant rushed up to Cook, the latter punched him and knocked him down. (Defendant's version of the incident differed, as will be set out.)

Cook testified that on the date of the shooting he went to the fence outside defendant's property and asked for his tools back. Defendant's girlfriend Stacy Campeau approached and hit Cook in the face, causing him to fall. Cook then entered the yard as Ms. Campeau continued to strike at him; Cook heard defendant say "It looks like my girlfriend is kicking your ass." Cook testified that he did not respond. Cook testified that he believed he was struck in the back of the head (inferentially by defendant wielding a shotgun)[2] and when he turned around, he was shot in the abdomen.

On cross-examination, Cook denied that he pursued Ms. Campeau, insisting that his only concern was to retrieve his tools. He admitted that he had had three beers and was feeling the effects to some extent. He confirmed that defendant had been the aggressor in the earlier incident when he had knocked the latter down. Cook testified that he did not remember threatening Ms. Campeau or approaching defendant, but admitted that due to his injuries his recollection was imperfect. He was adamant that he would not have taken a swing at a woman.

A neighbor of both the victim and the defendant described the incident rather differently. He testified that on the day of the shooting, he had met Cook at a Home

---

[2] Cook also testified that he had a palpable wound to the back of his head.

3

Depot and Cook spoke angrily about his dispute with defendant over the tools. Later in the day, he was spraying weeds on his property when Cook approached and told him that he planned to try and make it up with defendant. The witness saw Cook approach defendant's residence and knock on the door before returning. Cook drove away, but returned in a few minutes, evidently upset. Defendant came out of his residence and began to argue with Cook, both men cursing and speaking loudly. As Cook stood near defendant's motorcycle, defendant brandished a walking cane at him, saying something like "Don't touch my bike." The victim left again.

The witness then testified that the victim returned a third time to continue the dispute. While he did not see Ms. Campeau or the victim, he heard defendant say "Oh, a girl just got you." He then saw the victim enter defendant's property quickly and approach the residence, where Ms. Campeau was on the porch. Despite the victim's claim that he would never have hit a woman, the witness testified that Cook knocked Ms. Campeau down, or at least partly down. Before the witness could intervene, he saw the victim either fall or be pushed off the porch and land on his back.[3] The victim got up and began to go back up the porch stairs when the witness saw a flash, heard a bang, and saw that the victim had been shot. Defendant—for it was he—continued to strike at the victim until the latter fell. A police witness confirmed that the neighbor witness stated at the time that defendant continued to strike the victim with the shotgun after shooting him.

---

[3] The witness used the term "flying off."

4

Defendant's statement to police was then played for the jury. In essence he confirmed the sequence of events recounted by the neighbor, and elaborated that Cook had approached "drunk, high . . . goin' friggin' nuts," "rantin' and ravin' and cussin'." Defendant retrieved the shotgun (which in fact belonged to the victim) and testified that when he returned to the door, he saw the victim "snatchin' my chick . . . had his hands on her and they're . . . wrestlin' . . . I just . . . freaked . . . freaked out, man, and I shot the [expletive]." Defendant said he thought the victim might have grabbed Ms. Campeau's hair but claimed that he had only brought the gun out to give it back to the victim. However, he admitted that after the shooting he said, " 'Just die, mother fucker' " and that he had not seen any type of weapon in the victim's hands.

Both defendant and Ms. Campeau testified for the defense. In relevant part, and in addition to corroborating the neighbor's testimony about the sequence of events, Ms. Campeau testified that just before the shooting, Cook was threatening to kill her and "kick Kevin's [defendant's] ass." She also testified that Cook "charged" at her, grabbed her hair, and began punching her. Ms. Campeau also stated that Cook received the injury to his head not from being struck from behind, but when he fell off the porch. However, her testimony differed from defendant's pretrial statement in one respect; she indicated that after Cook fell off the porch, he got up and "charged" again, but as defendant had emerged, "instead of Steve charging me, he charged Kevin [defendant]." She then heard a "bang." Ms. Campeau further testified that Cook continued to threaten defendant even after Cook fell.

5

Finally, Ms. Campeau testified that defendant had a bad back and had had multiple back surgeries; as a result, he was in constant pain and had mobility problems. She denied that defendant could run or "charge" anyone, as the victim testified he did on the occasion of the motorcycle encounter.

On cross-examination she admitted that defendant was able to ride his motorcycle. She testified that after she knocked Cook down, she and defendant laughed, and that she was not frightened at that point. She was also impeached with her statements to police at the time in which she did not describe the victim as having run or "charged" at her, and did not say that he had punched her in the head.[4] Ms. Campeau also acknowledged that after the shooting, defendant got a beer and told her " 'I'm going to jail.' "

Defendant began by admitting a prior conviction for larceny and described his medical problems and disability, which he testified included persistent pain, the inability to bend, and the inability to sit or stand for extended periods. He testified that he used a cane to walk more than a few steps. According to defendant, it was Cook who attacked him on the occasion of the earlier encounter, when police were called.

Defendant admitted that after Ms. Campeau knocked the victim down, defendant went indoors to have a cigarette. He testified consistently with his pretrial statement that when he came back to the door after retrieving the shotgun (which he said he intended to

---

[4] We note, however, that the neighbor testified that Cook *did* appear to strike Ms. Campeau in the head.

6

return to Cook),[5] he saw the victim assaulting Ms. Campeau, with the latter screaming. He stated that he was "just devastated. I just couldn't believe this guy's beating on my chick, I mean." And when the victim "came towards me," "Next thing I know, the gun's going off." Defendant further testified that when he saw that the victim "got ahold of my chick swinging her around, beating on her," he became frightened. He claimed not to know how the gun discharged, even suggesting that the victim might have pulled the trigger, grabbing for the weapon, but admitted that it was cocked with the hammer back. He disclaimed any intent to shoot the victim.

The jury was instructed on attempted voluntary manslaughter on the theories both of heat of passion/provocation and imperfect self-defense, as well as self-defense. While it is not clear from the verdict which theory the jury relied upon in finding defendant guilty of attempted voluntary manslaughter, clearly it rejected at least some element of the self-defense claim.

### DISCUSSION

Although defendant frames his argument in terms of the People's asserted failure to prove "beyond a reasonable doubt" that he did not believe that shooting Cook was necessary to prevent serious harm to himself or Ms. Campeau (see *People v. Aranda* (2012) 55 Cal.4th 342, 360), in reviewing the verdict we take a somewhat different view of the evidence. Our task is not to decide whether *in our view* the prosecution proved that

---

[5] He testified that there was a shell "stuck" in the gun, but that he intended to shoot it into the air before giving it to Cook.

defendant's acts were legally without excuse to the "beyond a reasonable doubt" standard. Instead, we only determine whether a reasonable trier of fact could have found that the prosecution met this burden by producing evidence in support of the verdict that is reasonable, credible, and of solid value. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104.)

In order to claim true self-defense, a defendant must act in *real* fear of imminent death or danger of great bodily injury, *and* such fear must be reasonable. (Pen. Code, § 197, subd. (1); *People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305.) Although the version of events offered by defendant and Ms. Campeau certainly reflected a chaotic situation, it did not compel the conclusion that defendant acted in the belief that the victim was likely to inflict *great* bodily injury either on himself or Ms. Campeau.

First, defendant fetched the shotgun *before* the victim assaulted Ms. Campeau on the porch. His claim that he just intended to return the weapon to the victim was not particularly credible, and the jury's evident rejection of this testimony was certainly reasonable. Second, the neighbor's testimony was that defendant shot the victim at a time when the latter was at most preparing to re-engage with Ms. Campeau, but had not yet reached her. Ms. Campeau in fact testified similarly. Defendant's testimony was that he was "devastated" when he saw the victim grabbing Ms. Campeau and arguably striking her, and his assertion that he was in fear for her safety at the time of the shooting was no more credible than the inference that he shot the victim in rage. It is also to be noted that in his statement to police, defendant never claimed that the victim charged at

8

him, but clearly implied that he lost control of himself when he saw the victim struggling with, or assaulting, Ms. Campeau.

The conclusion that defendant acted out of sudden anger is buttressed by the evidence that defendant continued to bludgeon the victim after shooting him instead of backing off; that he told the victim to " 'just die,' " and that after the shooting he got a beer and remarked to Ms. Campeau that " 'I'm going to jail.' " All of these points support the conclusion that the shooting was intentional and committed out of anger rather than fear. (See *People v. Enraca* (2012) 53 Cal.4th 735, 759.)

In our view it is more likely that the jury relied on heat of passion as the basis for finding defendant guilty only of attempted voluntary manslaughter. However, if it relied on imperfect self-defense (see *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1178-1179), there was also constitutionally sufficient evidence to support this conclusion. The victim was not armed and no injuries had been inflicted on Ms. Campeau other than a few scratches and fingerprint bruises. Ms. Campeau had in fact repulsed him twice by knocking him down. The jury could have found that defendant genuinely believed that either he or Ms. Campeau was at risk of death or great bodily injury as required, but that any such belief was unreasonable so that it only rose to the level of *imperfect* self-defense.

Defendant also points to section 198.5, (the Home Protection Bill of Rights), which provides that "Any person using force intended or likely to cause death or great bodily injury within his or her residence shall be presumed to have held a reasonable fear

of imminent peril of death or great bodily injury to self, family, or a member of the household when that force is used against another person . . . who unlawfully and forcibly enters . . . the residence . . . ." An unenclosed front porch is not part of the "residence" for the purpose of this statute. (*People v. Brown* (1992) 6 Cal.App.4th 1489, 1496-1497.) Nevertheless, the jury *was* instructed on the presumption and evidently found that the prosecution's evidence was sufficient to rebut it. As our discussion above should make clear, this finding was fully appropriate.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER         <br>Acting P. J.

We concur:


KING         
        J.


MILLER       
        J.