Filed 6/28/21  P. v. Okamura CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>EVAN JADE OKAMURA,<br><br>Defendant and Appellant. | F078639<br><br>(Super. Ct. No. F17901731)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  John F. Vogt, Judge.

William I. Parks, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Evan Jade Okamura appeals his convictions of attempted murder (Pen. Code, §§ 664, 187, subd. (a);[1] count 1) with firearm use enhancements (§§ 12022.5, subd. (a), 12022.53, subd. (d), 12022.7, subd. (a)), assault with a semiautomatic firearm (§ 245, subd. (b); count 2) with firearm use enhancements (§§ 12022.5, subd. (a), 12022.7, subd. (a)), possessing a firearm while a felon (§ 29800, subd. (a)(1); count 3), carrying a concealed firearm (§ 25400, subd. (a)(2); count 4), and carrying a loaded firearm in public (§ 25850, subd. (a); count 5). Appellant contends certain statements he made to police should have been excluded from his trial and that the police were incorrectly allowed to identify him for the jury based on surveillance video. He argues any failure to object to the identity testimony constitutes ineffective assistance of counsel. Finally, in supplemental briefing, appellant challenges the imposition of certain fees and fines without consideration of his ability to pay. For the reasons set forth below, we affirm appellant's conviction and the fees and fines imposed.

## FACTUAL AND PROCEDURAL BACKGROUND

As the issues in this case turn on facts separate from the alleged crime, we provide a general overview here and include additional relevant facts when discussing the issues raised.

In February 2017, Alicia Vega and her boyfriend, Anthony Jon De La Cruz, were eating together in Fresno when they saw two men approach them. Feeling uncomfortable, they began to leave, but the two men followed. According to Vega, one of the men asked whether Vega and De La Cruz were members of the Bulldog gang. Vega responded by suggesting the two men were Norteno gang members and stating she and De La Cruz were not part of any gang. The discussion escalated, until De La Cruz stated, "[W]e don't want no problem, dog," which resulted in one of the men instructing the other to shoot them.

---

[1] All undesignated statutory references are to the Penal Code.

2.

Vega and De La Cruz attempted to leave. The two men pursued, and Vega was eventually shot twice. The two men then fled on foot. When police arrived, De La Cruz told them which direction the men fled.

Based on surveillance video from a nearby store and a search of known individuals living in the area where the two men fled, police identified Rigoberto De La Mora as a suspect. Surveillance of De La Mora led police to identify appellant as the second suspect. When interviewed, De La Mora stated that appellant had been the shooter. During the investigation and at trial, Vega identified appellant as one of the two men involved, noting at trial that he no longer had a goatee. And at trial, De La Cruz also identified appellant as the one who shot at them.

Appellant was tried and a jury convicted him of the offenses noted above. This appeal timely followed appellant's sentencing.

## DISCUSSION

Appellant raises three main allegations of error. First, appellant claims the trial court erred when it permitted Detective John Mendes to testify regarding statements made when appellant was interviewed by police. Appellant alleges these statements were made prior to appellant being apprised of his rights and thus were inadmissible. Next, in an argument spread across a merits-based and ineffective assistance of counsel claim, appellant contends the trial court allowed additional erroneous testimony from Mendes when it permitted him to identify appellant as the individual pictured on the store surveillance video. Finally, in supplemental briefing, appellant contests the restitution fine, court security fee, and conviction assessment imposed as part of his sentence on the ground the trial court failed to determine his ability to pay.

### *Appellant's Statements to Police Were Properly Admitted*

Appellant contends that statements about gang affiliation he made to police while in custody were improperly admitted because, although they were made after appellant was read his *Miranda* rights, the police had engaged in meaningful questioning prior to

3.

reading those rights and appellant's later invocation of his right to remain silent demonstrates the police had coerced his statements prior to that point. Appellant argues this error requires his convictions be set aside. The People respond, arguing that appellant forfeited this argument and, regardless, it is meritless because the initial questioning was little more than rapport building and thus proper. Even if an error occurred, the People contend it was harmless.

*Relevant Facts*

After appellant was arrested in connection with the shooting, on March 22, 2017, he was interviewed by police. At the time of his interview, appellant had been in custody for five hours. It is possible he had not eaten in that time. His interview was conducted in an 8-by-10-foot room, with little furnishings. Appellant was not handcuffed but was not free to leave. The interviewing officers were not in uniform and not wearing their guns.

Detective Mendes testified at trial regarding appellant's statements. Although Mendes testified to providing appellant his *Miranda* warnings prior to the interview, an audio recording of the interview showed that the officers engaged in conversation with appellant for approximately 11 minutes prior to the *Miranda* warnings being read. In those 11 minutes, the group spoke about football, appellant's hair, his family, his cell phone use, and the detail and meaning behind his tattoos. Mendes also elicited information such as appellant's name, birth date, residence, nationality, prior arrests, employment, and drug use. Mendes confirmed appellant knew he was under arrest for the shooting during this conversation, told appellant he knew about appellant's prior convictions and that appellant had likely received *Miranda* warnings in the past, explained to appellant that the police had learned what had happened in this case through their investigation and a video recording of the incident, and sought to convince appellant that he did not seem like a bad person and that telling the truth would give him an opportunity to explain his side of events.

4.

At this point, Mendes stated that he wanted to read appellant his *Miranda* rights "real quick." He then read each of the rights and asked whether appellant understood them, to which appellant replied, "Yes, sir." The conversation then returned to appellant's tattoos, before moving on to appellant's prior neighborhood in Sacramento, and various slang terms. After this, the conversation turned to appellant's gang affiliation. Mendes informed appellant that probation had him listed as a Norteno and asked whether appellant's Sacramento neighborhood was a Norteno area. Appellant confirmed it was and confirmed he was a Norteno.

A few minutes later, Mendes began asking questions about the shooting. He informed appellant the shooting was on video and that this was appellant's opportunity to explain what happened. At this point, appellant stated that he did not want to incriminate himself and that he "would like to remain silent and not say anything." Although further questions were asked, appellant maintained his desire to remain silent.

Although not perfectly clear in the appellate record, the trial court was aware that a *Miranda* issue needed to be resolved pretrial. Accordingly, it held an evidentiary hearing to determine what would be admissible. After taking testimony from Mendes and reviewing the audio recording of the interview, the trial court determined that appellant's statement he would like to remain silent invoked his rights under *Miranda*. The court thus decided it would "suppress everything after the first invocation or the statement that he didn't want to incriminate himself." The court then noted, "The question that came up in my further consideration, though is as to what was said before that. And the court is well aware that in all interviews of this nature that there is a—I guess I would characterize it as an introductory sort of discussion and conversation before the *Miranda* rights are officially and formally given. And in that section of this interview there is a lot of discussion about [appellant's] background, his various residences, family affiliations, and it is within all of that that the discussion of his gang association comes up.

"And it is my opinion that in the context of the conversation that preceded the formal *Miranda* warnings that the conversation was sufficiently noncoercive and proper in terms of establishing a base rapport between the interviewer and the interviewee and I will allow the officer to relate statements relating to his affiliation with the Nortenos." (Italics added.)

At trial, Mendes was asked the following questions on this issue:

"Q    After [appellant's] arrest, did you conduct an interview of the [appellant]?"

"A    Yes, I did.

"Q    During that interview, did the subject of [appellant's] affiliation with any criminal street gang come up?

"A    Yes, it did.

"Q    Did [appellant] admit membership in any criminal street gang?

"A    He told me he was a Norteno gang member."

*Standard of Review and Applicable Law*

To protect a suspect's Fifth Amendment privilege against self-incrimination, *Miranda* requires that, before a custodial interrogation, law enforcement must advise a suspect of the right to remain silent, that any statement made can be used against him or her in a court of law, that the suspect has the right to the presence of an attorney, and that if he or she cannot afford an attorney, one will be appointed, if requested, before questioning the suspect. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1085–1086 (*McCurdy*).) "A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*People v. Jackson* (2016) 1 Cal.5th 269, 339.)

These rights, however, may be waived. In such a case, " '[t]he waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" [citation], and knowing in the sense that it was

"made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." ' " (*McCurdy*, *supra*, 59 Cal.4th at p. 1086.)

"In addition, '[t]he due process clause of the Fourteenth Amendment precludes the admission of any involuntary statement obtained from a criminal suspect through state compulsion.' [Citation.] ' "The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citations.] In determining whether a confession was voluntary, ' "[t]he question is whether defendant's choice to confess was not 'essentially free' because his [or her] will was overborne." ' [Citation.] Whether the confession was voluntary depends upon the totality of the circumstances. [Citations.] ' "On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review." ' [Citation.]" [Citation.] " '[W]hen a reviewing court considers a claim that a confession has been improperly coerced, if the evidence conflicts, the version most favorable to the People must be relied upon if supported by the record.' " ' " (*McCurdy*, *supra*, 59 Cal.4th at p. 1086.)

" 'On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence.' [Citation.] The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review." (*People v. Linton* (2013) 56 Cal.4th 1146, 1176–1177.)

*Appellant's Statement Was Voluntary*

This court has undertaken an independent review of the record and the interview and concludes that appellant's statement of Norteno affiliation was voluntary and properly admitted. Looking at the circumstances surrounding the interview generally, we see nothing in the record that shows appellant's will was overborne by the circumstances of the questioning. There was nothing unusual about the interview room or the dress or

manner of the interviewing officers. There is no indication appellant was made inappropriate promises for his statements or otherwise coerced into speaking with officers. Further, officers read appellant his *Miranda* rights and he acknowledged he understood them. Despite this, appellant continued to speak with officers until the topic of conversation reached the actual shooting, at which time appellant invoked his right to remain silent. This behavior demonstrates that appellant was both fully aware of his rights and fully capable of exercising them at any point in the conversation.

Appellant contends that Mendes acted improperly by engaging in what sounded like light banter but were actually statements designed to initiate a confession and waiting to give the required *Miranda* warnings until just before asking the critical question. Appellant focuses on the connection between the officer's pre-*Miranda* questions about appellant's tattoos and prior residence and his post-*Miranda* questions about whether those tattoos reflected Norteno membership and whether appellant's prior residence was a Norteno area. We do not agree.

Looking at the questions asked prior to the *Miranda* warnings, we see nothing improper. "Law enforcement officers may speak freely to a suspect in custody provided ' "the speech would not reasonably be construed as calling for an incriminating response." ' " (*McCurdy*, *supra*, 59 Cal.4th at pp. 1086–1087.) Although there is overlap between the pre- and post-*Miranda* topics when viewed at a high level (i.e., tattoos and residence), a closer scrutiny shows the questions asked were actually quite different. With respect to tattoos, officers asked pre-*Miranda* questions about quality and craftsmanship and post-*Miranda* questions about meaning and connection. With respect to residence, they asked pre-*Miranda* questions about location and post-*Miranda* about gang involvement. In this sense, we agree with the People and the trial court that the pre-*Miranda* questions were well within the scope of general rapport building and introductory in nature. Although they may have been designed to make appellant more comfortable in responding to questions about gang affiliation later, such tactics are not

improper provided the initial questions themselves are not designed to generate incriminating responses. (*See McCurdy*, at p. 1087 [questions designed to establish a rapport with the defendant and not reasonably likely to elicit an incriminating response permitted].)

Turning to the post-*Miranda* questions, the record shows that Mendes did not merely rely on his prior questions to elicit statements from appellant. Rather, Mendes informed appellant that he had already been marked as a Norteno by probation, presumedly based on the prior convictions that had been noted, and then followed up to confirm that appellant was, in fact, a Norteno. Appellant identifies nothing deceptive about this tactic and fails to demonstrate "the motivating cause of his decision to speak was an express or clearly implied promise of lenience or advantage." (*McCurdy*, *supra*, 59 Cal.4th at p. 1088.) Upon review, we see nothing that would place Mendes's actions within those types of interrogations that potentially violate *Miranda* by seeking to obtain incriminatory statements both prior to and after *Miranda* warnings are given. (See, e.g., *People v. Camino* (2010) 188 Cal.App.4th 1359, 1376 [noting prior interview leaving little else to discuss prior to post-*Miranda* interview, made claims of error a close case].) Nor do we see any indications appellant's will to remain silent was overborne by the interview. Accordingly, we find no error in the trial court's ruling.[2]

## *Mendes's Identification of Appellant Was Proper*

Appellant next argues that the trial court erred in permitting Mendes to identify appellant in the context of reviewing a surveillance video from the night of the shooting. He contends the identification was improper because Mendes did not have personal knowledge of appellant's appearance at or before the time of the shooting and because

---

[2] We exercise our discretion to reach the merits and thus do not resolve the People's claim this issue was forfeited because the record indicates the issue was considered by the trial court, even if not expressly raised. (See *People v. Denard* (2015) 242 Cal.App.4th 1012, 1020 [appellate court has discretion to hear forfeited issues affecting substantial rights].)

the trial court did not conduct an explicit balancing under Evidence Code section 352. He alleges these errors denied him certain due process rights. Recognizing no direct objection was made to this testimony, appellant posits he received ineffective assistance of counsel with respect to the admission of this testimony.

The People respond, arguing that the lack of objection in this case forfeits appellant's direct concerns. However, given appellant's ineffective assistance of counsel claim, the People also contend Mendes's testimony was proper and not unduly prejudicial.

*Relevant Facts*

As noted above, a surveillance video from a nearby store showed the two individuals involved in the shooting. At trial, the video was played for the jury and Mendes testified that appellant was one of the individuals on the video, along with De La Mora. No objection was raised at the time the identification was made. Mendes's later testimony revealed he did not know what appellant looked like at the time the recording was made.

*Standard of Review and Applicable Law*

"A lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800.) '[T]he identity of a person is a proper subject of nonexpert opinion ….' " (*People v. Leon* (2015) 61 Cal.4th 569, 601 (*Leon*).) Rulings permitting such identifications are reviewed for abuse of discretion. (*Id*. at p. 600.)

*Discussion*

The People rightly note that no objection was made to the identification and, thus, this issue would typically be forfeited. However, as shown below, even if we overlooked this forfeiture, we would find no merit in appellant's complaint. (See *People v. Thompson* (2010) 49 Cal.4th 79, 121 & fn. 14 [analyzing merits of forfeited claim to

10.

resolve ineffective assistance of counsel contention while noting that such a claim does not automatically transform a forfeited claim into a cognizable one].)

Appellant argues the general rule of law is clear—that "[w]here a witness has personal knowledge of a defendant's appearance at or before the time a video was made or photo was taken, and his or her testimony would aid the trier of fact in determining identity, the lay opinion evidence is generally admissible." He contends, "[D]etective Mendes did no[t] have personal knowledge of appellant's appearance at or before the time of the shooting." From this, appellant argues the court should have exercised its duties pursuant to Evidence Code section 352 to exclude the testimony.

Although somewhat less clear, it appears appellant's argument raises two claims. First, that an officer may not provide a lay opinion identification if they were not familiar with the defendant prior to the criminal act. Second, that an officer's identification is unduly prejudicial. We reject both claims.

Upon review, we find appellant's arguments are foreclosed by *Leon*, *supra*, 61 Cal.4th 569. In *Leon*, the defendant alleged the trial court erred when it permitted an officer to identify him on surveillance videos showing two robberies. (*Id*. at p. 600.) The defendant argued the officer could not provide an admissible identification because the officer did not have contact with the defendant before the crimes. (*Id*. at p. 601.) Our Supreme Court soundly rejected this line of argument. After noting that courts had "long upheld admission of testimony identifying defendants in surveillance footage or photographs," the court rejected appellant's argument by explaining the timing of an officer's interaction with a defendant raised "a distinction without a difference" when it came to being able to identify the defendant in a video. (*Ibid*.) The court focused on the fact that the officer "was familiar with [the] defendant's appearance around the time of the crimes," having contacted the defendant the day after the crime. (*Ibid*.) It then noted both that the defendant's appearance had changed by the time of trial and that the surveillance video was played for the jury, allowing them to test the officer's

11.

identification. It concluded that "[q]uestions about the extent of [the officer's] familiarity with [the] defendant's appearance went to the weight, not the admissibility, of his testimony." (*Ibid.*)

Ultimately, the court's analysis demonstrates that a proper foundation showing knowledge of the defendant's relevant appearance is all that is required when there is a need for the identification. In this case, Mendes became aware of appellant's appearance within approximately one month of the crime through his investigation of the shooting and questioning of appellant after his arrest. There is no indication in the record that appellant's appearance changed substantially in that month. At trial, Mendes identified appellant in surveillance video based on his knowledge of appellant's appearance from that time. Moreover, Mendes, along with other witnesses, identified appellant and noted his appearance at trial was different than at the time of the alleged crime. In line with *Leon*, this is all that is required for admissibility of the identification.

Appellant's argument continues to suggest that, as a detective, Mendes's identification was sufficiently prejudicial that the trial court should have excluded it under Evidence Code section 352. To support this claim, appellant cites *People v. Mixon* (1982) 129 Cal.App.3d 118, 129, which noted that officer identification is not generally encouraged because it can create an impression that the defendant is regularly contacted by police.

Although no objection was raised which would require the trial court to engage in an Evidence Code section 352 analysis, we conclude the evidence was admissible under such an analysis. The identification carried probative value in that it placed appellant near the scene of the crime with a co-participant in the act. It further supported and supplemented identification testimony from that co-participant and the victims. In contrast, the only cognizable prejudice arose because the testimony came from an officer. However, this prejudice was no greater than any arising from evidence regularly admitted when an officer testifies at trial. There was no indication from the identification that

12.

appellant was known to Mendes from other criminal conduct or that the identification indicated some other prejudicial fact. As such, the evidence would have been admissible if subject to objection, and appellant cannot show its introduction was improper.

For these reasons, we find appellant would not be able to show error had this issue not been forfeited. As the evidence was properly admitted, the failure to object cannot demonstrate ineffective assistance of counsel. (See *In re Avena* (1996) 12 Cal.4th 694, 721 [ineffective assistance of counsel requires showing counsel's unprofessional errors were prejudicial].) Thus, appellant's arguments on this point fail.

### *Appellant Forfeited His Fines and Fees Issue*

In supplemental briefing, appellant argues a remand for resentencing is required because the trial court imposed a $200 court security fee (Pen. Code, § 1465.8), a $150 conviction assessment (Gov. Code, § 70373), and a $10,000 restitution fine (Pen. Code, § 1202.4, subd. (b)), without considering appellant's ability to pay. The People oppose this argument, contending the issue has been forfeited and that the analysis from *People v. Dueñas* (2019) 30 Cal.App.5th 1157 is inapplicable to this case. The People further contend any allegations here should be reviewed under the excessive fines clause.

We agree with the People that the issue was forfeited. This court has previously concluded that a failure to object to fines where statutory authority to do so exists forfeits any *Dueñas* claims that later arise. As appellant admits and his argument shows, the restitution fine imposed in this case was well above the minimum fine of $300. In this case, appellant raised no objection based on ability to pay with respect to the restitution fine imposed, despite having the statutory authority to do so when the court imposed more than the minimum restitution fine. (See § 1202.4, subd. (c).) Consistent with our opinion in *People v. Aviles* (2019) 39 Cal.App.5th 1055, the claim has thus been forfeited. (*Id.* at p. 1073.)

## DISPOSITION

The judgment is affirmed.

HILL, P.J.

WE CONCUR:

PEÑA, J.

DE SANTOS, J.